UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA

v.

JONATHAN Mason,
 also known as "Chip",
DEON Pugh,
 also known as "Big D",
KAREEM Mooney,
 also known as "Reno",
DENNIS Myers,
  also known as "Dino",  and
RYAN Pearson.

No. 18 CR 157

Judge John Z. Lee

## GOVERNMENT'S *SANTIAGO* PROFFER AND MOTION TO ADMIT EVIDENCE PURSUANT TO FED. R. EVID. 801(D)(2)(E)

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH JR., United States Attorney for the Northern District of Illinois, respectfully submits the following proffer of evidence as to the admission at trial of certain coconspirator statements against defendants Jonathan Mason, Deon Pugh, Kareem Mooney, Dennis Myers, and Ryan Pearson, and moves for the admission of such statements pursuant to Fed. R. Evid. 104(a) and 801(d)(2)(E) and *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978).

## I. INTRODUCTION

On June 28, 2018, a grand jury returned a twelve-count indictment against Jonathan Mason, Kevin Twyman, Kareem Mooney, Deon Pugh, Eduardo Anderson, Derrick Wiltz, Dennis Myers, Ryan Pearson, Alvin Williams, Martell White, and

Williams Rutledge. Count One of the Indictment charged Mason, Twyman, Mooney, Pugh, Anderson, Wiltz, Myers, Pearson, Williams, and White with conspiring to possess with intent to distribute and distribute a quantity of heroin, fentanyl, cocaine, and marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846. Currently, only Mason, Pugh, Mooney, Myers and Pearson are proceeding to trial, which is currently set to begin on June 15, 2020.[1]

In this submission, the government describes the law governing coconspirator statements, outlines some of its evidence establishing the charged conspiracy, and sets forth some of the coconspirator statements for which a pretrial ruling by the Court is requested, in accordance with *Santiago*, 582 F.2d at 1130-31, and established practice in this Circuit. *See United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009); *United States v. Harris,* 585 F.3d 394, 398, 400 (7th Cir. 2009).

This submission does not detail all of the government's evidence that would establish the existence of the conspiracy or all of the coconspirator statements that were made in furtherance of the charged conspiracy. Rather, this submission

---

[1] On October 15, 2018, Rutledge pled guilty to Count Eleven of the indictment, which charged him with possession with intent to distribute a quantity of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. § 841(a)(1). (R. 326.) On February 20, 2019, White pled guilty to Count Eight of the indictment, which charged him with possession with intent to distribute a quantity of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 841(a)(1). (R. 384.) On May 20, 2019, Williams pled guilty to Count One of the indictment, which charged him with conspiracy to possess with intent to distribute and distribute 100 grams or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. § 846. (R. 450.) On May 20, 2019, Kevin Twyman pled guilty to Count Five of the indictment, which charged him with possession with intent to distribute 400 grams or more of a mixture and substance containing a detectable amount of heroin, in violation of 21 U.S.C. § 841(a)(1). (R. 452.) On February 4, 2020, Eduardo Anderson and Derrick Wiltz are set for change of plea hearings. (R. 534-35.)

highlights for the Court certain of the government's evidence sufficient to establish the existence of the conspiracy described in Count One of the indictment and the participation of the coconspirators. As a result, this submission does not list all of the government's evidence and witnesses, nor does it provide all of the evidence that will be presented by identified witnesses.

## II.     OVERVIEW OF THE NARCOTICS CONSPIRACY

As alleged in Count One of the indictment, defendants Mason, Mooney, Pugh, Myers and Pearson conspired with each other and with the other charged defendants to possess with intent to distribute and distribute heroin, fentanyl, cocaine, and marijuana between September 2017 and continuing until March 2018. The coconspirators were members of the Gangster Disciples ("GD") and Black Disciples street gangs and primarily distributed narcotics on the south side of Chicago. Mason's home, located on the 6400 block of South Champlain Avenue, was the center of the conspiracy. Mason and Pugh, along with Mooney, regularly mixed narcotics at Mason's residence, and the narcotics were distributed to other members of the conspiracy out of Mason's home for sales to customers in the neighborhood.

Each of the coconspirators played different roles in the conspiracy. Mason and Pugh were responsible for overseeing the narcotics operation, which included obtaining and mixing narcotics for other coconspirators to distribute and supervising the street-level distribution of narcotics. Specifically, Mason supplied heroin and cocaine and oversaw the distribution of those narcotics primarily out of his residence. Mason directed Anderson, Myers, and Wiltz in distributing narcotics, and mixed

narcotics with Twyman in Mason's residence. Pugh supplied heroin, cocaine, and marijuana and oversaw the distribution of those narcotics at the Parkway Gardens housing complex located between 63rd and 66th street and Martin Luther King Drive, the 400 block of East 63rd street, and worked with Mason mixing narcotics at, and distributing narcotics from, Mason's residence. Pugh directed Williams, Pearson, and White in their distribution of heroin and cocaine and facilitated the supply of heroin to Mooney for distribution.

## III. GOVERNING LAW

Federal Rule of Evidence 801(d)(2)(E) provides that a "statement" is not hearsay if it "is offered against a party" and is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Admission of such coconspirator statements against a defendant is proper where the government establishes by a preponderance of the evidence that: (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the statements were made during the course and in furtherance of the conspiracy. *United States v. Cruz-Rea*, 626 F.3d 929, 937 (7th Cir. 2010).[2]

### A. Existence of and Membership in the Conspiracy

In accord with *United States v. Santiago*, 582 F.2d 1128 (7th Cir. 1978), this Court must determine whether statements by the defendants' coconspirators will be

---

[2] No Sixth Amendment confrontation issues arise by the use of a non-testifying coconspirator's statements, offered for their truth against a defendant because they are not testimonial. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (citing *Davis v. Washington*, 547 U.S. 813, 823-24 (2006) and *Crawford v. Washington*, 541 U.S. 36 (2004)); *see also United States v. Hargrove*, 508 F.3d 445, 448-49 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial).

4

admissible at trial under Federal Rule of Evidence 801(d)(2)(E). In making this determination, this Court must decide "if it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy ...." *Id*. at 1143 (quoting *United States v. Petrozziello*, 548 F.2d 20, 23 (1st Cir. 1977)); *see also United States v. Hoover*, 246 F.3d 1054, 1060 (7th Cir. 2001). If this Court determines the statements are admissible, the jury may consider them for any purpose. *United States v. Thompson*, 944 F.2d 1331, 1345 (7th Cir. 1991).

Under *Santiago*, the government must make a preliminary offer of evidence to show: (1) a conspiracy existed; (2) the defendants and declarant were members of the conspiracy; and (3) the statements sought to be admitted were made during and in furtherance of the conspiracy. *Santiago*, 582 F.2d at 1134-35; *see also, e.g., United States v. Alviar*, 573 F.3d 526, 540 (7th Cir. 2009). According to *Bourjaily v. United States*, 483 U.S. 171, 176-81 (1987), the court can consider the statements in question (the statements to be admitted) to determine whether the three *Santiago* criteria have been met.

Seventh Circuit cases construing *Bourjaily* have held that properly admitted hearsay, including statements admitted under the coconspirator exception to the hearsay rule (Fed. R. Evid.801(d)(2)(E)), may be used to prove what another person did or said that may demonstrate their membership in the conspiracy. *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir. 1994) ("[W]hile only the defendant's acts or statements could be used to prove that defendant's membership in a conspiracy,

evidence of that defendant's acts or statements may be provided by the statements of co-conspirators."); *United States v. Martinez de Ortiz*, 907 F.2d 629, 633 (7th Cir. 1990) (en banc).

While this Court may consider the proffered statements themselves as evidence of both the existence of a conspiracy and the defendants' participation in it, *United States v. Bourjaily*, 483 U.S. 171, 178, 180 (1987); *United States v. Harris*, 585 F.3d 394, 398-99 (7th Cir. 2009), the contents of the proffered statements alone are not sufficient to establish the existence of a conspiracy and a defendant's participation. There must also be some supporting evidence or facts corroborating the existence of the conspiracy and a defendant's participation. *Harris*, 585 F.3d at 398-99. The evidence showing the existence of a conspiracy and a defendant's membership in it may be either direct or circumstantial. *See United States v. Johnson,* 592 F.3d 749, 754-55 (7th Cir. 2010); *United States v. Irorere*, 228 F.3d 816, 823 (7th Cir. 2000).[3]

There is no requirement, under Rule 801(d)(2)(E), that the government establish all elements of a conspiracy, such as a meeting of the minds and an overt

---

[3] The coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted. Accordingly, statements by coconspirators may be admitted against a defendant, without establishing the Bourjaily factual predicates set forth above, when such statements are offered to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *See United States v. Guyton*, 36 F.3d 655, 658 (7th Cir. 1994) (statement that defendant out of cocaine not hearsay because showed membership in conspiracy); *United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988) (addressing "war stories" about the drug trade); *United States v. Van Daal Wyk*, 840 F.2d 494, 497-98 (7th Cir. 1988) (statements had non-hearsay value to establish knowledge of and membership in conspiracy); *United States v. Tuchow*, 768 F.2d 855, 867-69 (7th Cir. 1985) (pre-conspiracy statements admissible to set scope of anticipated conspiracy).

act. *United States v. Coe*, 718 F.2d 830, 835 (7th Cir. 1983); *United States v. Gil*, 604 F.2d 546, 548-50 (7th Cir. 1979). The government need only establish the existence of a joint venture for an illegal purpose (or for a legal purpose using illegal means) and participation in the joint venture by the defendant and the maker of the statement at issue (as well as that the statement was in furtherance of the venture). "[I]t makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy." *Gil*, 604 F.2d at 549-550; *see also Coe*, 718 F.2d at 835.

While there is thus a distinction between conspiracy law and admissibility under Rule 801(d)(2)(E), certain principles of general conspiracy law are relevant to the Rule 801(d)(2)(E) inquiries. For instance, "[a] conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997); *see also United States v. Longstreet,* 567 F.3d 911, 919 (7th Cir. 2009); *United States v. Jones*, 275 F.3d 648, 652 (7th Cir. 2001). The government need not prove that a defendant knew each and every detail of the conspiracy or played more than a minor role in the conspiracy. *United States v. Curtis*, 324 F.3d 501, 506 (7th Cir. 2003). Further, a defendant joins a criminal conspiracy if he agrees with another person to one or more of the common objectives of the conspiracy; it is immaterial whether the defendant knows, has met, or has agreed with every coconspirator. *Longstreet,* 567 F.3d at 919; *Jones*, 275 F.3d at 652.

A defendant (or other declarant) may be found to have participated in a

conspiracy even if he joined or terminated his relationship with other conspirators at different times than another defendant or coconspirator. *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir. 1985); *see also United States v. Handlin*, 366 F.3d 584, 590 (7th Cir. 2004) ("it is irrelevant when the defendant joined the conspiracy so long as he joined it at some point"). Under Rule 801(d)(2)(E), a coconspirator's statement is admissible against conspirators who join the conspiracy after the statement is made. *United States v. Sophie*, 900 F.2d 1064, 1074 (7th Cir. 1990). A coconspirator who has become inactive or less active in the conspiracy nevertheless is liable for his coconspirators' further statements unless he openly disavows the conspiracy or reports it to the police. *See United States v. Feldman*, 825 F.2d 124, 129 (7th Cir. 1987).

The government is not required to prove the identity of the declarant; nor must the declarant's identity be confirmed in the statement itself. *See United States v. Bolivar*, 532 F.3d 599, 604-05 (7th Cir. 2008). Rather, the government need only prove (from the statement, the context and/or other evidence) that the declarant was in fact a coconspirator. *Id.*

## B.    Statements Made "In Furtherance of" the Conspiracy

In determining whether a statement was made "in furtherance" of the conspiracy, courts evaluate the statement in the context in which it was made and look for a reasonable basis upon which to conclude that the statement furthered the conspiracy. *See Cruz-Rea,* 626 F.3d at 937; *United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000). Under the reasonable basis standard, a statement may be

susceptible to alternative interpretations and still be "in furtherance" of the conspiracy. *Cruz-Rea*, 626 F.3d at 937-38. The "coconspirator's statement need not have been made exclusively, or even primarily, to further the conspiracy" in order to be admissible under the coconspirator exception. *Id.* at 937 (quotations and citations omitted). That statements were made to a government cooperating witness or undercover agent does not bar admission of statements otherwise "in furtherance" of the conspiracy. *United States v. Mahkimetas*, 991 F.2d 379, 383 (7th Cir. 1993); *see also United States v. Ayala,* 601 F.3d 256, 268 (4th Cir. 2010).

"Courts have found a wide range of statements to satisfy the 'in furtherance' requirement." *United States v. Cozzo*, 2004 WL 1151630 *2-3 (N.D. Ill. 2004) (collecting cases). In general, a statement that is "part of the information flow between conspirators intended to help each perform his role" satisfies the "in furtherance" requirement. *United States v. Alviar*, 573 F.3d 526, 545 (7th Cir. 2009) (quotations and citations omitted). *See also United States v. Gajo*, 290 F.3d 922, 929 (7th Cir. 2002). These include statements made:

- to conduct or help to conduct the business of the scheme, *United States v. Cox*, 923 F.2d 519, 527 (7th Cir. 1991); *see also United States v. Johnson*, 200 F.3d 529, 533 (7th Cir. 2000);[4]

- to recruit potential coconspirators, *Cruz-Rea*, 626 F.3d at 937-38; *United States v. Haynes*, 582 F.3d 686, 705 (7th Cir. 2009), abrogated on other grounds by *United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012);

- to identify other members of the conspiracy and their roles, *Alviar,* 573 F.3d at 545;

---

[4] Statements that prompt the listener to act in a manner that facilitates the carrying out of the conspiracy are also made "in furtherance" of the conspiracy. *See United States v. Monus*, 128 F.3d 376, 392 (6th Cir. 1997).

- to plan or to review a coconspirator's exploits, *United States v. Molt*, 772 F.2d 366, 369 (7th Cir. 1985);

- as an assurance that a coconspirator can be trusted to perform his role, *United States v. Sophie*, 900 F.2d 1064, 1073-74 (7th Cir. 1990); *see also United States v. Bustamante*, 493 F.3d 879, 890-91 (7th Cir. 2007);

- to inform and update others about the current status of the conspiracy or a conspiracy's progress (including failures), *United States v. Rea*, 621 F.3d 595, 605 (7th Cir. 2010); *Alviar*, 573 F.3d at 545;

- to control damage to an ongoing conspiracy, *United States v. Johnson,* 200 F.3d 529, 533 (7th Cir. 2000); *United States v. Molinaro,* 877 F.2d 1341, 1343-44 (7th Cir. 1989)*; United States v. Van Daal Wyk*, 840 F.2d 494, 499 (7th Cir. 1988);

- to conceal a conspiracy where ongoing concealment is a purpose of the conspiracy, *Gajo*, 290 F.3d at 928-29; *United States v. Kaden*, 819 F.2d 813, 820 (7th Cir. 1987); *see also United States v. Maloney*, 71 F.3d 645, 659-60 (7th Cir. 1995);

- to reassure or calm the listener regarding the progress or stability of the scheme, *Sophie*, 900 F.2d at 1073; *Garlington v. O'Leary*, 879 F.2d 277, 284 (7th Cir. 1989);

- to report conspirators' status and in turn receive assurances of assistance from coconspirators, *United States v. Prieto*, 549 F.3d 513 (7th Cir. 2008);

- "describing the purpose, method or criminality of the conspiracy," *United States v. Ashman*, 979 F.2d 469, 489 (7th Cir. 1992);

- statements to outsiders "to serve as a salesmanship technique to enhance his position in the eyes of [the outsider] and give confidence about the ability of the organization," *United States v. Stephenson*, 53 F.3d 836, 845 (7th Cir. 1995); *United States v. Curtis*, 37 F.3d 301, 308 (7th Cir. 1994).

Finally, it has long been the rule that any statement made by a conspirator during and in furtherance of a conspiracy is admissible against all coconspirators. *Beeson v. United States*, 90 F.2d 720 (7th Cir. 1937); *United States v. Lindemann*, 85

F.3d 1232, 1238 (7th Cir. 1996); *see also United States v. Rivera,* 136 F. App'x 925, 926 (7th Cir. 2005) ("Whether any other conspirator heard (or, in this instance, saw) that statement is irrelevant; agency, not knowledge, is the theory of admissibility.").

### C.  Alternative Bases for Admissibility of Statements

Various statements made during the course of a conspiracy are independently admissible and do not require a Rule 801(d)(2)(E) analysis. A defendant's own statements, for example, are admissible against him pursuant to Rule 801(d)(2)(A), without reference to the coconspirator statement rule, and statements that are directives or are not offered for their truth are also admissible as non-hearsay.

### 1.  Defendant's Own Statements

Many statements described herein and sought to be admitted against the defendant are independently admissible and do not require a Rule 801(d)(2)(E) analysis. A defendant's own admissions, for example, are admissible against him pursuant to Fed. R. Evid. 801(d)(2)(A), without reliance on the coconspirator-statement rule.[5] *See United States v. Maholias*, 985 F.2d 869, 877 (7th Cir. 1993). Additionally, a defendant's own admissions are relevant to establishing the factual predicates for the admission of coconspirator statements against him. *See United States v. Godinez*, 110 F.3d 448, 455 (7th Cir. 1997); *United States v. Potts*, 840 F.2d 368, 371-72 (7th Cir. 1987).

---

[5] Rule 801(d)(2)(A) provides in pertinent part that a "statement" is not hearsay if "[t]he statement is offered against a party and is … the party's own statement, in either an individual or a representative capacity."

## 2.    Non-Hearsay Statements

The coconspirator statement rule is not implicated where the relevant verbal declaration is not a "statement" within the meaning of Rule 801(a), that is, not an "assertion" subject to verification. An example would be an order or a suggestion. *See United States v. Tuchow*, 768 F.2d 855, 868 n.18 (7th Cir. 1985). This is because a "statement" is defined as "an oral or written assertion" or "nonverbal conduct of a person, if it is intended by the person as an assertion." Fed. R. Evid. 801(a). Thus, a statement which is incapable of verification, such as an order or a mere suggestion, is not hearsay and does not invoke a Rule 801(d)(2)(E) analysis. *See Tuchow*, 768 F.2d at 868.

Finally, the coconspirator statement rule does not apply when a statement is not being offered for the truth of the matter asserted, and thus does not constitute "hearsay" as defined by Rule 801(c).[6] Accordingly, statements by alleged coconspirators may be admitted against a defendant, without establishing the *Bourjaily* factual predicates set forth above, when such statements are offered simply to show, for instance, the existence, the illegality, or the nature or scope of the charged conspiracy. *Gajo*, 290 F.3d at 929-30; *see also United States v. Herrera-Medina*, 853 F.2d 564, 565-66 (7th Cir. 1988); *Van Daal Wyk*, 840 F.2d at 497-98; *Tuchow*, 768 F.2d at 867-69.

---

[6] Federal Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

### 3. Statements Against Penal Interest

Under Federal Rule of Evidence 804(b)(3), a hearsay statement is admissible if (1) the declarant is unavailable; (2) the statement was against the declarant's penal interest at the time it was made; and (3) corroborating circumstances exist indicating that the statement is trustworthy. *See United States v. Lewis*, 641 F.3d 773, 783 (7th Cir. 2011). When determining whether a statement is against penal interest, each portion of a proffered out-of-court statement is examined to determine whether it subjected the declarant to criminal liability. *United States v. Westmoreland*, 240 F.3d 618, 626 (7th Cir. 2001). A statement may satisfy this requirement if it would be probative at trial against the declarant. *United States v. Nagib*, 56 F.3d 798, 804 (7th Cir. 1995). Applying this standard, the Seventh Circuit has held that a declarant's inculpatory statements made to friends and acquaintances about crimes committed by the declarant and his associates are admissible. *See, e.g. United States v. Hamilton*, 19 F.3d 350, 357 (7th Cir. 1994) (holding that a jailhouse conversation between two codefendants which incriminated a third codefendant but was also inculpatory of the first two co-defendants was admissible against the third codefendant); *United States v. Curry*, 977 F.2d 1042, 1056 (7th Cir. 1992) (affirming the district court's decision to admit a co-defendant's inculpatory statement which also incriminated the defendant because it was not made in an attempt to curry favor with law enforcement, but was made to an acquaintance).

Such statements against penal interest are admissible against non-declarant defendants. *See United States v. Volpendesto*, 746 F.3d 273, 288 (7th Cir.) *cert. denied*

*sub nom. Sarno v. United States*, 135 S. Ct. 382 (2014) and *cert. denied sub nom. Polchan v. United States*, 135 S. Ct. 383 (2014); *United States v. Watson*, 525 F.3d 583, 587-88 (7th Cir. 2008); *United States v. Hamilton*, 19 F.3d 350, 356 (7th Cir. 1994). *See also United States v. Smalls*, 605 F.3d 765, 773-81 (10th Cir. 2010).

### 4.   Contextual Statements Made by Individuals Not Charged as Coconspirators

Many of the recordings that the government intends to admit at trial include statements of individuals who are not identified in the indictment as coconspirators. These statements are still admissible and are not hearsay because the government will not offer them for the truth of the matter asserted. *See* Fed. R. Evid. 801(c); *see also United States v. York*, 572 F.3d 415, 427 (7th Cir. 2009) ("When offered for context and not for the truth, the declarant's statements are not hearsay."). This is also the reason that the recorded telephone calls will not violate the Confrontation Clause of the Constitution—that is, "so long as those tapes are offered to provide context for the defendant's own admissions," the recorded telephone calls will not violate the Confrontation Clause. *See id.*; *see also United States v. Simmons*, 582 F.3d 730, 736 (7th Cir. 2009) (explaining that there is "no reason to question the [district] court's judgment that it would be helpful for the jury to have that context as opposed to hearing only one half of conversations that were two-sided"). To avoid any confusion, this Court should also instruct the jury that the recorded statements of nonconspirators should be considered only for the context that the statements provide and not for their truth. *See York*, 582 F.3d at 736 (explaining that instruction stating

14

that the jury should consider statements for context and not truth was appropriate when admitting full recorded conversation).

### 5. The Supreme Court's Crawford Decision Has Not Changed the Admissibility of Co-Schemer Statements

Only "testimonial" statements implicate the Confrontation Clause, *Crawford v. Washington,* 541 U.S. 36 (2004), and a statement made in furtherance of a conspiracy is, by definition, not a testimonial statement. *United States v. Nicksion*, 628 F.3d 368, 374 (7th Cir. 2010) (rejecting confrontation clause claim as to introduction of coconspirator statements because such statements are not testimonial); *United States v. Hargrove*, 508 F.3d 445, 448 (7th Cir. 2007) (coconspirator statements are neither hearsay nor testimonial).

Further, even if a hearsay statement does not qualify for admission under Rule 801(d)(2)(E), or any other hearsay exception, that fact alone would not create a Confrontation Clause issue because, again, only testimonial statements implicate the right to confront a witness. *Crawford,* 541 U.S. at 68 ("Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as . . . would an approach that exempted such statements from Confrontation Clause scrutiny altogether."); *see also Volpendesto*, 746 F.3d at 289 ("[a] statement unwittingly made to a confidential informant and recorded by the government is not 'testimonial' for Confrontation Clause purposes.").

IV.    **EVIDENCE DEMOSNTRATING THE EXISTENCE OF THE CHARGED CONSPIRACY AND EACH DEFENDANT'S PARTICIPATION IN THE CONSPIRACY**

As summarized below, the government's evidence of the existence of the conspiracy will include: (1) the testimony of a cooperating defendant, Derrick Wiltz, regarding the operation of the conspiracy, the roles of each member of the conspiracy, and specific distribution events; (2) dozens of intercepted telephone calls among the coconspirators discussing the procurement and distribution of narcotics between November 2017 and March 2018, as well as the operation of the conspiracy; (3) the testimony of a cooperating source about controlled narcotics purchases from Mason and involving other members of the conspiracy, as well as the presentation of video and audio recordings of those controlled purchases; (4) the testimony of undercover officers about controlled narcotics purchases from Pearson and involving other members of the conspiracy; (5) evidence of law enforcement's seizure of the conspiracy's narcotics; (6) text message communications regarding the mixing and distribution of narcotics; and (7) video recorded surveillance, including footage from pole cameras and Chicago Police Department ("CPD") POD cameras of the coconspirators, including footage from outside of Mason's residence.

Below, the government summarizes some of the evidence that it will present regarding the existence of the charged conspiracy. Such evidence clearly establishes the threshold requirement for admitting coconspirator statements during the trial of this case. As a preliminary matter, the government notes that, at times, the defendants used coded language and street terminology when talking about narcotics,

which is of course common practice for individuals who engage in narcotics trafficking. The government expects to introduce expert testimony about this use of coded language and street terminology for narcotics and firearms.

## A.    An Overview of the Conspiratorial Evidence

As noted above, and as this Court is well aware, most conspiracies are clandestine operations that have no formal agreement or structure. Indeed, the Seventh Circuit has noted that "[d]ue to the covert nature of a conspiracy, direct evidence is rare." *United States v. Rodriguez*, 53 F.3d 1439, 1445 (7th Cir. 1995). It is the rare case that has a plethora of direct evidence establishing the conspiracy. But the sources of evidence the government plans to present at trial, including recorded telephone conversations and meetings, agent testimony, and laboratory results, establishes the existence of the conspiracy charged in the indictment, and the defendants' participation in that conspiracy, sufficient to admit coconspirator statements pursuant to Fed. R. Evid. 801(d)(2)(E).

It is important to note at the outset of this evidence overview that in the narcotics context, a conspiracy exists when a buyer and a seller is assisted by a third person. *See United States v. Payton*, 328 F.3d 910, 912 (7th Cir. 2003) (in cases "involving middlemen, brokers, runners, or go-betweens, the buyer-seller argument is irrelevant . . . because the conspirators are on the same side of the sale"); *accord United States v. Larkins,* 83 F.3d 162, 167 (7th Cir. 1996) (holding that co-defendants on the "same side of the transaction" can conspire with each other); *United States v. Lechuga,* 994 F.2d 346, 350 (7th Cir. 1993) (noting that a buyer can conspire with someone who acts as a "go-between, facilitator, sales agent, and general helper");

17

*United States v. Manzella*, 791 F.2d 1263, 1265-66 (7th Cir. 1986) (broker "was as much a part of the conspiracy as a real estate broker is a part of the deal to sell a house"); *United States v. Herrera*, 54 F.3d 348, 353-54 (7th Cir. 1995) (rejecting argument that because co-defendants only "came together on one occasion for one purpose—to buy drugs—that that they could not have committed a conspiracy" because "all of the defendants are on one side the cocaine deal").

To determine whether a narcotics buyer or seller is on the same side of the transaction as an alleged co-conspirator, all that is necessary is evidence that the two worked together. *See Payton*, 328 F.3d at 911-12; *United States v. Adkins,* 274 F.3d 444, 450-51 (7th Cir. 2001) (concluding that conspiracy existed between seller and "go-between"). Evidence that a middleman or broker was paid by one side of the transaction is a strong indicator that the broker was on that side of the transaction. *See United States v. Thomas*, 284 F.3d 746, 753 (7th Cir. 2002); *United States v. Rivera*, 273 F.3d 751 (7th Cir.2001); *United States v. Contreras*, 249 F.3d 595 (7th Cir. 2001).

### B.     Testimony of Derrick Wiltz

At trial, the government anticipates calling cooperating witness Derrick Wiltz – a coconspirator who personally distributed heroin on behalf of the conspiracy.  The government expects Wiltz to testify to the following, among other things:

Beginning in or around February of 2017, Wiltz began going to Mason's house on a daily basis. While there, he would do anything Mason asked him to do. This included transporting narcotics to customers, purchasing mixing agents, which included lactose and Dormin, driving Mason wherever he requested, and completing

other errands on behalf of Mason. Wiltz also distributed narcotics for Mason on numerous occasions.

According to Wiltz, Mason primarily sold heroin, but, at times, also sold crack cocaine and marijuana, through his associates, primarily on the streets of the South Side of Chicago. Mason obtained large quantities of pure heroin and used a compressor at his house to re-rock the heroin. During the re-rocking process, Mason added mixing agents to the pure heroin, which included black tar heroin, lactose, Dormin, and fentanyl. Mason re-rocked heroin on a weekly basis with the help of numerous associates including, Pugh, Mooney and Twyman. The associates would assist Mason in an assembly line fashion and would each take a share from the profits of the sale of the narcotics.

The government expects Wiltz to testify regarding the role of Mooney in the conspiracy. According to Wiltz, between April 2017 and March 2018, Mooney was at Mason's house every day. Mooney brought Mason heroin to re-rock almost every day, sometimes as much as several hundred grams. Mooney also introduced Mason to a supplier and acted as a broker between them. At Mason's direction, Wiltz drove Mooney to the supplier's residence located at 51st and Martin Luther King Drive at least four or five times. Wiltz also met Mooney at the supplier's residence at least four or five times. On those occasions, Mooney gave Wiltz 200 to 300 grams of heroin to take back to Mason. On at least seven occasions, Mason had Wiltz bring money to the narcotics supplier's residence. The amounts ranged from $3,000 to $12,000.

Because of Mooney's relationship with Mason, Wiltz also performed any tasks Mooney asked of him, including picking up and dropping off narcotics, primarily heroin. On several occasions, Wiltz picked up distribution quantities of cocaine, heroin, and black tar heroin from an individual Wiltz knows as "Poo," who lived on 71st Street west of Western Avenue in Chicago. After Wiltz picked up the cocaine or heroin, Wiltz brought it to Mooney or Mason at Mason's house. Mason would re-rock the heroin and cook the cocaine with baking soda and 7-up in the microwave. After it was cooked, Mason and Mooney each took quantities of the cocaine and heroin. According to Wiltz, at the direction of Mason, Wiltz dropped off money to Poo on two occasions, each time $2,000 or $3,000.

At times, Wiltz would provide narcotics to Mooney's customers. Wiltz remembers two males who each purchased 8-balls or small quantities of cooked up cocaine from Mooney, and Wiltz dropped 20 to 40 grams of heroin to a customer named Nemo approximately four times per month. Wiltz met Nemo at his house on 54th Street and Shields in Chicago, next to a vacant lot.

The government expects Wiltz to testify regarding a November 16, 2017 narcotics transaction with a customer known as "Tow Truck" or "Tow Truck Man." According to Wiltz, Mason directed him to take five grams of heroin and deliver it to a customer they referred to as "Tow Truck" or "Tow Truck Man," who was located at 109th and State Street in Chicago, Illinois. According to Wiltz, Wiltz took the heroin from behind the mirror in the Master bedroom's bathroom in Mason's house, broke a

piece off of a larger block of heroin and weighed it on a scale that was in the bedroom before taking it to Tow Truck at Tow Truck's house.

The government expects Wiltz to testify regarding a February 7, 2018 narcotics transaction involving Mason, Mooney, and Pugh. Wiltz remembers overhearing a conversation between Mooney and Pugh that occurred on February 7, 2018, during which Pugh told Mooney he was at Mason's house and Mooney asked Pugh to go to the 25th floor. According to Wiltz, the "25th floor" referred to 25 grams of heroin. They used the code word "floor" when discussing a specific customer, a black male who was approximately 60 years old and ran a heroin and cocaine line out of a building located at 43rd Street and S. Cottage Grove Drive in Chicago. Wiltz also remembers that on February 7, 2018, Mooney came to Mason's house. Mason gave Wiltz heroin and told Wiltz to take it to Mooney. Wiltz walked outside and handed the heroin to Mooney, who was sitting in his car.

The government expects Wiltz to testify regarding a February 12, 2018 narcotics transaction involving Mason and Mooney. Wiltz also recalls that on February 12, 2018, while Wiltz was outside of Mason's house, Mooney told Wiltz to go into the house and get something from Mason. Wiltz did as Mooney asked. Mason gave Wiltz approximately 5 grams of heroin and Wiltz went back outside. Mooney told Wiltz to put the heroin in Mooney's car. Wiltz placed the heroin in the top center of the console. Later on, Mooney told Wiltz, Pugh, and Mason that law enforcement stopped him when he had the heroin in the car. Mooney told Wiltz, Pugh, and Mason that he hid the heroin "in his ass."

The government expects Wiltz to testify regarding the role of Pugh in the conspiracy. According to Wiltz, he observed Pugh at Mason's residence almost every day. Pugh regularly brought heroin and marijuana to Mason's residence. Pugh brought the heroin for Mason to re-rock and helped Mason re-rock and bag the re-rocked heroin into user amounts for street distribution. Pugh used yellow and pink baggies for his narcotics.

The government expects Wiltz to testify that on February 9, 2018, Mason gave Wiltz 100 grams of heroin and told Wiltz to take it to the BP gas station located at 63rd and State Street in Chicago. According to Wiltz, Wiltz drove a gray Buick to the location, but he did not see anyone there to hand the heroin to. Wiltz then received a call from Pugh, who gave Wiltz a description of the person Wiltz should look for. Wiltz saw an individual matching the description Pugh provided. The individual approached Wiltz's car and retrieved the heroin.

The government expects Wiltz to testify regarding the role of Pearson in the conspiracy. On February 9, 2018, Mason, Pugh, and Mooney were all at Mason's house packing re-rocked heroin. Mooney opened the baggies, which were pink and yellow, and Mason and Pugh put the heroin in the baggies. Based on Wiltz's observations, after the re-rocked heroin was bagged, Pugh provided the bundles to Pearson who worked at the corner store, selling heroin, weed, and crack for Pugh.

The government expects Wiltz to testify regarding the role of Twyman in the conspiracy. Based on Wiltz's observations, on approximately 15-20 occasions, Twyman supplied Mason with narcotics, usually black tar heroin and fentanyl. Wiltz

22

observed Twyman bring fentanyl to Mason's house, which Twyman and Mason used to re-rock heroin. They disposed of the vials in a vacant lot located next to Mason's residence.

According to Wiltz, on another occasion, Wiltz observed Twyman come to Mason's house with a book bag that contained four to five vials of fentanyl, a large chunk of black tar heroin, and a chunk of heroin. Mooney and Pugh were at Mason's residence that day as well. Mason and Pugh had heroin in addition to what Twyman brought. Mason had Wiltz obtain Dormin and lactose to use as mixing agents. Mason, Mooney, Pugh, and Twyman all assisted in re-rocking the heroin. Mason mixed the black tar heroin, heroin, Dormin and lactose using blenders and Pugh used a strainer. Once the mixture was complete, Mason placed it inside a plastic bag and used a compressor to harden the mix back into brick form. The others helped with the process by either mixing or bagging the finished product.

Wiltz will also testify that after Mason and Twyman were stopped by law enforcement, Mason returned to Mason's house. Wiltz was already at his house, along with Pugh, Mooney, and Myers. Mason told them about the stop and seizure of narcotics.

### C. Intercepted Communications

During the conspiracy, members of the conspiracy spoke with each other about narcotics distribution and the operation of the conspiracy. Some of those communications are summarized below.

23

**1. On November 9, 2017, Mason, Twyman, and Myers conspired to obtain narcotics for distribution to customers.**

As set forth in the Complaint (Dkt. # 1 ¶¶ 80-95)[7], on November 9, 2017, Mason and Twyman discussed Twyman obtaining narcotics that Mason and Twyman could sell. Mason and Twyman then discussed meeting and eventually met at Restaurant B on East Cermak Road in Chicago. As part of this transaction, Myers picked Mason up from Mason's residence and drove Mason to the restaurant. Shortly after the meeting, Mason and Myers discussed having Wiltz retrieve the narcotics from Myers.

**2. On November 7, 2017, Mason and Mooney conspired to obtain narcotics for distribution.**

On November 7, 2017, at approximately 2:31 p.m. (TP1 Session #304), Mason received an incoming call from Mooney. Mooney said, "Hey Big Bell on his way over there you hear me." Mason replied, "Yeah." Mooney said, "Ugh, he pay for that picture frame [narcotics] man. He got to pay for that." Mason said, "Oh." Mooney said, "I don't even know he umm what the fuck he did with the other motherfucking movies [narcotics][8], man. You know or what the fuck he think this is. I don't know if he got some motherfucker that's trying to umm look at the movies [narcotics] or what. Got to pay for it Roadie." Mason stated, "Alright."

---

[7] For ease of reference, to the extent evidence has already been summarized in the complaint in this case, the government references that citation.

[8] To the extent the coconspirators use code words, the government will introduce testimony regarding the meaning of those code words. The testimony that the government intends to introduce with respect to specific words is included in this proffer in brackets.

At approximately 8:41 p.m. (TP1 Session #428), Mason placed an outgoing call to Mooney. Mooney said, "Yeah. Yeah?" Mason replied, "I got that uh, the movie, uh coming here right now [narcotics arriving at a location in the area of 87th street and Martin Luther King Jr. Drive]." Mooney stated, "OK, that's cool. I'm finna come back that way [relocate to Mason's location]."

At approximately 10:43 p.m. (TP1 Session #468), Mason received an incoming call from Mooney. Mason said, "How long you think before you come up here, Reno?" Mooney answered, "I'm on my way right now man, right now, right now."

### 3. On November 11 and 12, 2017, Mooney and Mason conspired to obtain and distribute narcotics to customers.

On November 11, 2017, at approximately 5:00 p.m. (TP1 Session #1393), Mason placed an outgoing call to Mooney. Mooney asked, "Yeah, Chip?" Mason responded, "Hello." Mooney said, "Chip!" Mason stated, "I'm right here by the um. I'm around by the building." Mason said, "Listen, I got the goo (unintelligible)." Mooney said, "You got to take it?" Mason answered, "Yeah. Hold on. Come on." Mooney said, "OK. Here I. Come."

According to video surveillance, at approximately 5:08 p.m., an unknown male exited Mason's residence and walked towards a gold GMC van. Approximately one minute later, a red Chevy Trailblazer arrived and parked across from the gold GMC van. The unknown male then walked to the back of the gold GMC van and turned on the gold GMC van. Mooney exited the red Chevy Trailblazer and walked towards the unknown male, who had moved to the front of the Gold GMC van. Mooney and the unknown male engaged in a conversation.

25

At approximately 5:10 p.m., the unknown male reentered Mason's residence. Mooney returned to the red Trailblazer's driver side door, closed it, and walked towards the gold GMC van. Approximately one minute later, the unknown male exited Mason's residence and entered the passenger side of the gold GMC van. The gold GMC van departed the area.

At approximately 5:27 p.m. (TP1 Session #1406), Mason placed an outgoing call to Mooney. Mooney stated, "Alright. I'm finna pull up." Mason responded, "He trying to leave. I already stalled him a whole hour." Mooney replied, "I'm finna to pull up. Start that van up."

At approximately 5:48 p.m., the gold passenger van returned to the area of Mason's residence and parked on the street. The unknown male exited the passenger side and Mooney exited the driver side of the gold GMC van. Both men entered Mason's residence.

At approximately, 5:50 p.m., Wiltz arrived in a white cargo van and entered Mason's residence. A few minutes later, Wiltz exited Mason's residence and after opening and closing the passenger door of the gold GMC van, Wiltz entered the red Trailblazer and departed the area.

At approximately 6:45 p.m., Wiltz returned, exited the vehicle with a bag in hand, and entered Mason's residence. At approximately 7:16 p.m., the unknown male, Wiltz, and Mooney exited Mason's residence. Mooney carried a white bag in hand, entered the red Trailblazer and, after briefly stopping next to the gold GMC van, departed the area.

On November 12, 2017, at approximately 2:26 p.m. (TP1 Session #1685), Mason received an incoming call from Mooney. Mason said, "What up Reno?" Mooney said, "What happen?" Mason responded, "Ain't nothing happen yet. That motherfucker ain't called me back." Mooney said, "Sleep like a motherfucker. Smitty coming?" Mason said, "Huh?" Mooney asked, "Smitty coming?" Mason replied, "Hope, so." Mooney said, "OK, I'm finna goddamn umm, shoot out here right quick then do this shit." Mason said, "Alright." Mooney said, "I still had dude wanted them umm little other movies [unknown male wanted narcotics]." Mason said, "It's umm yeah." Mooney said, "Movies [narcotics], hear me?" Mason responded, "You say what?" Mooney asked, "8 [referring to quantity of narcotics]?" Mason replied, "Yeah, well hold them for 'em [keep the narcotics for unknown male to purchase]." Mooney said, "Alright."

### 4. On November 15, 2017, Pugh and Mason conspired to distribute narcotics.

On November 14, 2017, at approximately 8:52 a.m. (TP1 Session #2078), Mason called Pugh. Pugh said, "I need, I need a clean yard [an amount of narcotics]." Mason replied, "Ok. Ok." Pugh continued, "I need to uh, I need to get a few more dollars together though. I got, I got like 52 [$5,200] right now. I need, I been wait on a couple more dollars but that's what I need though man." Mason responded, "I'm finna call him right now. I'll call you right back."

At approximately 9:21 a.m. (TP1 Session #2085), Mason called Pugh, and said, "Dog, I text him. I'm waitin' on him to hit me right back." Pugh responded, "Aight." Mason replied, "Hit you right up."

On November 15, 2017, at approximately 1:12 p.m. (TP1 Session #2311), Mason received a call from Pugh. Pugh stated, "Hey, got somethin' else for us. But we need, we to need uh, what we need to do right." Pugh continued, "We need to uh, make it for, make it for your number right? But I got to be, it got to be able to withstand [of high enough quality to be mixed with additives]. You know what I'm sayin'? Cuz it's gonna go down the way. But it's got to be able to withstand some." Pugh continued further, "But listen, right? I'm fittin' I'm fittin' the, but the man he this other nigga my other little man from out of town 'cuz I had told him to wire me some so it's mine right?" Pugh continued, "But he God damit say he gonna send me a few dollars. He gonna send me a few dollars. He gonna send me like twenty-five [$2,500] but instead of me just takin the five, he's gonna give me and then he needs the uh, two thousand for him. I'm just gonna try to send him a fifty [50 grams of narcotics]. See what I'm sayin'? That's fifty [50 grams], at fifty [$50 dollars per gram, a total of $2500 dollars for the 50 grams], you feel me? But I need it for the what's the name so I need you. I need you to do yours, you know?" Mason replied, "Right, right." Pugh responded, "It got to be able to withstand, you feel me? If it'll be able to withstand, we good. So I'm fittin' to umm, I'm fittin' to, I told him to send twenty-five [$2,500] so I'm gonna see what he's gonna send me right fast. Mason replied, "Aight, what about the other boy?" Mason continued, "What about other dude? Tell him to hold off?" Pugh responded, "Umm that, that yard?" Mason replied, "Yeah." Pugh responded, "I never got all the money. That's why I was tryin' to book this dude right fast. I was waitin' on this, this the nigga I was waitin' on. But in the midst of me

28

waiting on him to send me somethin' he's sayin' he needs somethin'. You see what I'm saying?" Mason replied, "Right." Pugh continued, "But I know I gain more by just sendin' the whole what's the name out there and then give him a day or two and just, you know what I'm sayin'?" Mason replied, "Ok." Pugh responded, "But see, I just needed to be able to uh, you know." Mason replied, "I know. I know. It is." Pugh responded, "Aight, so I'm finna um, as soon as I touch that, Imma call you. But how I want you to do it…cuz it's gonna be somethin' separate."

At approximately 1:39 p.m. (TP1 Session #2131), Mason received an incoming call from Pugh. Mason stated, "I was just fittin' to call you. He gone see me to about two-thirty." Pugh replied, "Oh aight, uhhh, he say that six solo [price per gram] right?" Mason responded, "Six." Pugh continued, "Aight. He on. I'll probably need a little longer than two-thirty then." Pugh continued further, "I ain't got shit, I ain't got somethin' like fifty three hundred [$5,300] man. Trying to see who the fuck I can get a few hundred from- Ya'll need to just let me go ahead and go on back to work. I'm tired of this shit. Than I need the other shit to come back. I ain't even burn that shit yet. I just had went got five thousand from big homie. He try, you know what I'm sayin' just go on and get somethin' to keep the block going now." Mason responded, "Right. Right." Pugh replied, "You know it's for the block [neighborhood] goddamit. After this, your shit they got left. God. The block fittin' to be dead [the neighborhood is low on narcotics]. I gotta do something immediately man." Mason responded, "Ok." Pugh replied, "I got like fifty-three [$5,300] on me though man, so, I'm fittin' to umm see where I can few a few more dollars from man." Mason replied, "Aight."

At approximately 2:36 p.m. (TP1 Session #2152), Mason received an incoming call from Pugh, who asked, "You got a few dollars you can put with my shit for me?" Mason responded, "What you mean?" Pugh replied, "I, I only got God damit have about fifty four hundred [$5,400]." Mason stated, "Shit, I don' have that right now." Pugh continued, "Aight, well just go on and do it man. Holla at me when you got it." Mason replied, "Aight, he fittin' to uh, I'll wait on you 'til you leave out the house anyway. Should be, that's why I just called, tell him to come on."

At approximately 4:55 p.m., Mason, sent a text message to Pugh, which read, "It's here." At approximately 5:00 p.m. (TP1 Session #2190), Mason, received a call from Pugh, who said, "I'm still waiting on a couple of (unintelligible) that's why-I mean, I'm coming for sure bro. I'm just waiting on a couple of figures, y'know? My little man told me give him like thirty or forty minutes, he be getting off the road so, God damit I be uhh coming. I mean as long as if it's what fool got I ain't got to do no checking or nothing. Long as it's the same one Ox got, I'm cool."

At approximately 5:52 p.m. (TP1 Session #2357), Mason received a call from Pugh. Pugh stated, "Aight, uh, just do what I had told you. Just put, leave it all [do not package for distribution]. I was going to separate it, leave it all in one, they'll figure it out when they get back." Mason responded, "Ok". Pugh replied, "But, I'll be over there in a minute. That 5-0 at your number." Mason responded, "It's gonna be. It's gonna be [of good quality]." Mason continued, "That's a promise." Pugh replied, "I got thirteen, fourteen motherfuckers [customers] that get up with every two to three

30

days." Pugh continued, "If you keep it like I need you to keep it, man you got all this. I wouldn't dare go [obtain narcotics] nowhere else. I promise you man." Mason responded, "It's going to be there. It's going to be there. I promise you." Pugh replied, "I just need them to not be able to say, ahh have none of that, you know what I'm saying?" Mason responded, "They ain't going to say that bro. They ain't going to say that." Pugh continued, "I be there in a minute man. And mine come in the back end that's why I say I need them not to cry at all, but-" Mason replied, "It's going to be there. It's going to come in." Pugh responded, "He ain't sent me nothing but he want (unintelligible) one twenty five, he took out the money, they cost (unintelligible) the 50 and I got the rest, twenty-four something man. Mine going to be on the back end so I need you to God damit make sure I'm able to get mine, you see what I'm saying?" Mason replied, "No problem, trust me, it's coming."

At approximately 7:27 p.m., video surveillance captured a red sedan, a rental car registered to Pugh's wife, arrive and park south of Mason's residence. An individual resembling Pugh exited the driver seat and entered the residence.

### 5. On November 16, 2017, Mooney, Mason, and Wiltz conspired to distribute narcotics.

On November 16, 2017, at approximately 11:11 a.m. (TP1 Session #2507), Mason received an incoming call from Mooney. Mooney said, "When Do Dirty get back give him five of those concert tickets [five grams of heroin] so he can meet dude and give it to him." Mason clarified, "Give him what? Mooney replied, "5 of them concert tickets." Mason stated, "Okay."

As described in greater detail above, Wiltz recalled that Mason provided him with five grams of heroin to take to the customer known as "tow truck man." Wiltz then distributed the narcotics to the customer.

### 6. On November 16 and 17, 2017, Pugh and Mason conspired to purchase and distribute narcotics

On November 16, 2017, at approximately 12:50 p.m. (TP1 Session #2534), Mason received an incoming call from Pugh. Mason said, "Go ahead big dog." Pugh replied, "We got a couple things we need to do, man." Mason said, "Sure." Pugh said, "We need a picture for 175 [a sample ("picture") of narcotics for a customer who wants to purchase 175 grams of narcotics]." Mason said, "Uh huh." Pugh stated, "We need a picture [sample], we need a picture for another 50 [a sample of narcotics for a customer who wants to purchase 50 grams of narcotics]." Mason said, "Hey Roadie. You remember what I gave you last night [narcotics Mason provided to Pugh]? I ran into my man last night after you left. This is way better [quality of the narcotics is better]. Man we just over. Man I'm telling you way--" Pugh asked, "What?" Mason answered, "And that thing is good." Pugh said, "The one you--" Mason said, "The one I gave you. I got another. My man came after you left and boy we shut some motherfuckers down. Took 'em down. I ain't gone lie to you. And I just call them now. They still fucked up." Pugh said, "So shit, you want me to bring that one back to you. Naw--." Mason said, "No, I'm just saying that's good, that's good." Pugh asked, "The one we got, they ain't feeling that?" Mason answered, "Man, my man. Yep." Pugh said, "Oh, alright. Well look, we need that 175 [175 grams], we need a picture [sample] for him, we need a picture [sample] for a motherfucker with a 50 [50 grams]. And I finna

text you something else though right fast." Mason said, "Go ahead, go ahead, I'm finna leave this school right down here then I'm uh be at home." Pugh said, "Alright."

At approximately 5:29 p.m. (TP1 Session #2613), Mason placed an outgoing call to Pugh. Mason asked, "What's up, big dog?" Pugh said, "Hello?" Mason asked, "What up, big dog?" Pugh answered, "I'm finna come over there. Did you see my text for (unintelligible)?" Mason said, "Uh, uh, uh. I didn't understand. The 146 [quantity of money], what's that?" Pugh said, "That's for uh, that's for, nah. I said I had needed that for my um, I had needed to get that from you so we could do a what's his name." Mason said, "Oh, oh. Shoot. You might have to wait a--" Pugh said, "I had needed it. (unintelligible) I mean (unintelligible)." Mason said, "I need to uh. Give me a second, to little do something though. Know what I'm saying? Cuz I had--" Pugh said, "I need to come grab them and go see if we can do the other two right fast though." Mason said, "Come holler at me." Pugh said, "Alright."

At approximately 5:46 p.m., video surveillance captured a red Hyundai sedan, bearing California license plate 7TRL101 ("Pugh's vehicle"),[9] park on the west side of Champlain near Mason's residence. An individual resembling Pugh entered Mason's residence. At approximately 6:01 p.m., the individual resembling Pugh exited the residence and entered the red Hyundai sedan and departed the area.

On November 17, 2018, at approximately 1:51 p.m. (TP1 Session #2802), Pugh placed an outgoing call to Mason and said, "The fifty fighting [the sample for the 50

---

[9] Secretary of State records provided that Hertz LLC, is the registered owner of the red 2017 Hyundai Sedan, bearing California license plate 7TRL101. According to Hertz LLC rental car company records, the vehicle was rented in the name of Kimberly Pugh from 11/1/2017 through 01/02/2018. Kimberly Pugh is believed to be the wife of Pugh.

grams is of high quality], thought imam have to go and grab that and shoot that over there to my cousin, He, uh, I ain't gonna make none off of him, but I'm just locking him in cause its, man that once they see him move it, they gonna want that you know?" Pugh continued, "…he got like $4,900, you know what I'm saying? I'll bring that thing so you can god damit grab that 5-0 [50 grams] real fast. The 175, they ain't, they call me I just tried to call them back but now they ain't answering [the customer who wanted the 175 grams had not contacted Pugh]. But they in the same neighborhood, around over there around Laflin and Ada and all that. So, nine times out of ten, if my cousin biting, I know they biting too, you know what I'm saying?" Mason replied, "Uh huh." Pugh said, "But, I locked the fifty for sure, the fifty and I be able to get that in about another 45."

At approximately 2:46 p.m. (TP1 Session #2820), Pugh placed an outgoing call to Mason, using Target Phone 1, and stated, "I'm on my way, um, my little cousin and them ready." Mason replied, "Ok, that's uh--" Pugh responded, "The 5-0" Mason replied, "Ok, alright." Pugh responded, "I'll be there in about 15 minutes."

At approximately 3:10 p.m., video surveillance captured Pugh's vehicle park in front of Mason's residence. An unknown male with a beard wearing a yellow jacket, black hat, dark pants and white shoes exited the passenger side back seat of the vehicle and knocked on Mason's residence with no answer. At approximately, 3:14 p.m., the unknown male re-entered Pugh's vehicle and departed the area.

At approximately 3:15 p.m. (TP1 Session #2833), Pugh, received an incoming call from Mason, who stated, "…I'm right here, I just got off on 67th." Pugh said,

"Aight, let me, Ima umm, Ima shoot my daughter to this braid shop and just come back then man…Don't move though man 'cause (unintelligible) keep waiting on me." Mason replied, "I ain't going nowhere."

At approximately 3:38 p.m., video surveillance captured a red Hyundai arrive and park in front of Mason's residence. According to video surveillance, Pugh exited the driver's door and entered the vestibule of Mason's residence. At approximately 3:44 p.m., Pugh placed an outgoing call to Mason. Mason stated, "I'm here big dog." Pugh replied, "I'm knockin' on this door. I been knockin' on the door." Subsequently, video surveillance observed Pugh on his phone inside of the vestibule of 6424 S. Champlain. Pugh was then observed entering Mason's residence. At approximately 3:45 p.m., Pugh exited the residence, re-entered the Hyundai, and departed the area.

### 7. On November 18, 2017, Pugh and Mason conspired to distribute narcotics.

On November 18, 2017, at approximately 12:19 p.m. (TP1 Session #2992), Mason received an incoming call from Pugh. Mason asked, "Yeah big dog?" Pugh replied, "You heard me?" Mason asked, "What you say?" Pugh replied, "I say we got another fifty [grams of heroin] right." Mason said, "Say that again." Pugh said, "I say we got another fifty." Mason said, "We good." Pugh said, "Alright listen. But this nigga here keep crying about it. He cry about it being too hard [the texture and density of the heroin was not to the customer's liking]. Like if it be too hard, these motherfuckers went in on it, you know what I'm saying? So we got to try to find some pieces that's not that hard for him." Mason said, "OK. I see you in one minute." Pugh asked, "You know what I'm saying?" Mason answered, "I gotcha." Pugh said, "Right

OK. I promised. I'm telling you I got a bunch of motherfuckers but a lot of them cry about little different shit. You know what I saying?" Mason said, "I gotcha." Pugh asked, "You know what I'm saying?" Mason answered, "I gotcha." Pugh said, "Aight, I see you umm, as soon as you get through with the funeral, call me. I'm waiting on you." Mason said, "OK." At approximately, 10:30 p.m. a red sedan arrived an parked in the area of Mason's residence. Pugh exited the driver seat and entered Mason's residence.

### 8. On December 5, 2017, Mooney and Mason conspired to distribute narcotics to a customer.

On December 5, 2017, at approximately 6:03 p.m. (TP1 Session #6502), Mason received an incoming call from Mooney. Mason said, "What's up brother?" Mooney responded, "Where you at?" Mason answered, "Pullin' up at home." Mooney said, "Hey, Do-Dirty [Wiltz] need to go see the tow truck man out there." Mason asked, "Out where?" Mooney answered, "In the 100s, you know the tow man. The tow truck driver." Mason stated, "The tow truck." Mooney responded, "My man in the tow truck…" Later in the conversation Mooney said, "That motherfucker (unintelligible) I think he might come on about 9 or 10. Hey, I need to call Do-Dirty [Wiltz], dude just called me again. I need to get him [Wiltz] over there." As described above, Wiltz will testify that the "Tow Truck Man" was a narcotics customer of the conspiracy.

### 9. On February 7, 2018, Pugh, Mooney, and Wiltz conspired to distribute narcotics.

On February 7, 2018, at approximately 9:42 p.m. (TP3 Session #82), Mooney called Pugh and asked, "You in the crib?" Pugh asked, "Huh?" Mooney asked, "You at home?" Pugh responded, "I'm on the block. I'm at Chip [Mason's] crib." Mooney

stated, "Go to the uh, 25th floor [25 grams] real quick." Pugh clarified, "The who?" Mooney confirmed, "To the 25th floor." Pugh asked, "25th?" Mooney responded, "Yeah. Pugh stated, "Alright." Mooney replied, "I'm on my way over there." Pugh replied, "Alright."

According to video surveillance, at approximately 10:00 p.m., a dark grey Toyota Camry with dark tinted windows arrived outside of MASON's residence. The grey Toyota Camry stopped in the middle of the street in front of the residence and remained running. Approximately two minutes later, Wiltz exited Mason's residence and approached the driver side of the vehicle. Seconds later, the grey Toyota Camry departed the area and Wiltz re-entered Mason's residence. According to Wiltz, at the direction of Mason, he distributed approximately 25 grams of narcotics to Mooney.

> **10.    On February 9, 2018, Pugh and Pearson conspired regarding narcotics proceeds and resupplying Pearson with narcotics to distribute to the conspiracy's customers.**

As set forth in the Complaint (Dkt. #1 ¶¶ 143-145), in intercepted telephone calls on February 9, 2018, Pugh and Pearson discussed Pearson's narcotics proceeds. Pugh told Pearson he would meet him at the store where Pearson distributed narcotics. Pugh and Pearson then discussed Pearson's loyalty to Pugh because of the money Pugh allowed Pearson to make.

> **11.    On February 10, 2018, Pugh and Pearson conspired regarding narcotics proceeds and resupplying Pearson with narcotics to distribute to the conspiracy's customers**

As set forth in the Complaint (Dkt. #1 ¶¶ 146-147), in intercepted telephone calls on February 10, 2018, Pugh discussed with Pearson the amount of cocaine Pearson had remaining and Pugh inquired about the amount of narcotics proceeds

Pearson had collected. Pugh told Pearson that Pugh might come collect narcotics proceeds and drop off additional narcotics.

**12.      On February 15, 2018, Pugh and White conspired regarding law enforcement action.**

As set forth in the Complaint (Dkt. #1 ¶¶ 161-162), in intercepted telephone calls on February 15, 2018, Pugh warned White about a black minivan that he believed was following him and belonged to law enforcement, as part of their ongoing narcotics distribution conspiracy; Pugh told White that he had informed Pearson and another associate to take a break from selling narcotics while law enforcement was in the area.

**13.      During February 2018 intercepted calls, Pugh and Mason conspired to further the operations of the conspiracy.**

As set forth in the Complaint (Dkt. #1 ¶¶ 117-125), in intercepted telephone calls between February 9, 2018 and February 12, 2018, Pugh and Mason discussed their narcotics distribution conspiracy, including the rate at which narcotics were selling, the quality of the narcotics being sold, customer complaints about the narcotics and Mason supplying Pugh with additional narcotics to sell.

**D.      Controlled Narcotics Purchases by CS-1**

**1.      On September 14, 2017, Mason, Anderson, and Wiltz distributed approximately 99.6 of heroin to CS-1.**

As set forth in the Complaint (Dkt. #1 ¶¶ 14-38), between September 7, 2017 and September 14, 2017, CS-1 and Anderson communicated in consensually recorded telephone calls and text messages about Anderson selling a distribution quantity of heroin to CS-1. On September 14, 2017, CS-1 met Anderson, Wiltz and Mason at a

restaurant where Anderson and Wiltz sold CS-1 99.6 grams of heroin for $10,000. In addition to the testimony of CS-1, Wiltz will also testify about his participation in this transaction with Mason and Anderson.

### 2. On October 18, 2017, Mason and Wiltz distributed approximately 115.4 grams of heroin

As set forth in the Complaint (Dkt. #1 ¶¶ 39-51), between October 17, 2017, and October 18, 2017, CS-1 and Mason communicated in consensually recorded telephone calls and text messages about Mason selling a distribution quantity of heroin to CS-1. During the initial call, CS-1 told Mason that the heroin he had received from Mason on September 14, 2017 was short. Mason agreed to provide an additional five grams of heroin to account for the missing quantity. On October 18, 2017, CS-1 met Mason and Wiltz at a restaurant where Mason and Wiltz sold CS-1 115.4 grams of heroin for $9,350. In addition to the testimony of CS-1, Wiltz will also testify about his participation in this transaction with Mason.

### 3. On November 22, 2017, Mason, Myers, and Anderson distributed approximately 113 grams of heroin to CS-1.

As set forth in the Complaint (Dkt. #1 ¶¶ 52-75), between November 20, 2017, and November 22, 2017, CS-1 communicated with Anderson about another purchase of narcotics from Anderson. During the initial call, CS-1 complained to Anderson about the quality of the heroin he had received from Mason on October 18, 2017. In subsequent intercepted telephone calls, Anderson and Mason discussed Anderson telling CS-1 that Anderson and Mason were not selling narcotics together so that CS-1 would believe that the narcotics Anderson was distributing were of a higher quality.

Anderson and Mason discussed Mason sending a runner, Wiltz or Myers, to deliver the narcotics to Anderson so that CS-1 would not believe the narcotics were from Mason.

On November 22, 2017, in intercepted calls, Myers and Anderson discussed Myers meeting with Anderson at Anderson's work, and Myers was observed by law enforcement surveillance leaving Mason's residence and arriving at Anderson's work at approximately the same time that CS-1 arrived at Anderson's work to purchase narcotics. CS-1 then purchased approximately 113 grams of heroin from Anderson.

### E.    Undercover Purchases

#### 1.    On February 24 and 26, 2018, Pearson distributed heroin to an undercover officer.

As set forth in the Complaint (Dkt. # 1 ¶¶ 183-185), on February 24, 2018, Pearson sold an undercover officer approximately .8 grams of heroin in two red tinted bags in exchange for $20.

As set forth in the Complaint (Dkt. #1 ¶ 186), on February 26, 2018, Pearson sold an undercover officer heroin in five red tinted bags in exchange for $50. According to the March 6, 2018 Illinois State Police lab report, the baggies contained approximately 2.1 grams of fentanyl-laced heroin.

Following the arrest of Pearson on March 14, 2018, law enforcement searched Pearson's residence and recovered numerous red-tinted plastic baggies. According to a July 26, 2019 DEA lab report, the red-tinted plastic baggies contained heroin.



That same day, law enforcement conducted a search of Mason's residence. During the search law enforcement took photographs of narcotics packaging materials, including small red-tinted baggies.



Wiltz will testify, as described in greater detail above, and as demonstrated in text message conversations described in greater detail below, that Pugh mixed narcotics with Mason and other coconspirators at Mason's residence and packaged those narcotics in red-tinted baggies.

**F.    Law Enforcement Seizures of Narcotics From Co-Conspirators and Intercepted Communications Among Co-Conspirators About the Seizures**

      **1.    On December 6, 2017, Mason and Twyman Obtained Approximately 496 Grams of Fentanyl.**

As set forth in the Complaint (Dkt. #1 ¶¶ 99-116), between November 29, 2017, and December 6, 2017, Mason and Twyman discussed Twyman obtaining narcotics,

41

including cocaine, heroin and black tar heroin, from Twyman's supplier. On December 6, 2017, Twyman and Mason discussed meeting the supplier. Mason then discussed the proposed meeting with Mooney.

Specifically, on December 6, 2017, at approximately 4:42 p.m. (TP1 Session #6690), Mason placed an outgoing call to Mooney. Mason stated, "Hey he [Twyman] uhh, he want to take me with him, to the motherfucker [supplier] house." Mooney asked, "Huh?" Mason stated, "He coming to get me to take me with him. So I can uhh just talk to him. Know what I'm saying? Tell him, he want me to do the talking." Mooney asked, "Which one you talking about K [Twyman]?" Mason responded, "Yeah, yeah. Yeah. Yeah." Later in the conversation, Mooney stated, "I'll call you and check up on you."

Later that evening, law enforcement surveillance observed Twyman pick up Mason at Mason's residence, drive to a location in the West Loop of Chicago, and an individual provide Twyman with a yellow package. Shortly thereafter, law enforcement seized the yellow package from Twyman and Mason and determined it to contain at least approximately 496 grams of fentanyl.

The following day, Mason discussed the seizure with Mooney. More specifically, on December 7, 2017, at approximately 8:32 a.m. (TP1 Session #6696), Mason placed an outgoing call to Mooney. Mooney said, "You good?" Mason replied, "Yeah, hey now that I think about it, that was a straight up robbery [the law enforcement officers confiscating narcotics]. You know what made me do too roadie?" Mooney responded, "What?" Mason said, "All the time this shit happen in less than

42

ten minutes [narcotics were confiscated less than ten minutes after Mason and Twyman received the narcotics]." Mooney said, "Right." Mason said, "They [law enforcement officers] say, "Hey make sure you all leave them phones on the seats, so a motherfucker don't tape nothing. Know what I'm saying?" Mooney replied, "Uhh huh." Mason said, "And they was up outta there in six minutes." Mooney replied, "Right." Mason said, "They didn't….They make sure motherfuckers leave them phones on the seat and got the fuck up outta there. That's a flat out robbery. Flat out…" Mooney asked, "The phone…was up in that car?" Mason replied, "They was in…the car with dude [Twyman] and we had 'em in our hands and they, put them phones down leave 'em on the seat. They didn't search the car for less than three minutes roadie. You hear me?" Mooney said, "Uhh huh." Mason said, "Three minutes for to got that and got up outta there." Mooney said, "Uhh…" Mason said, "Why they didn't they go through no struggle and finding out really who I am? You know what I'm saying?" Mooney replied, "Uhh huh…" Mason said, "I ain't got no I.D. You know uhh motherfucker take you through the trenches…I could be lying to them. I could've gave them any name." Mooney said, "Uhh huh…"

Mason said, "Yeah, that was a robbery…That was on his [Twyman's] motherfucking end, whatever the fuck he got going on. Whatever he got going on, it happen on his end." Mooney said, "Yeah. Exactly what it was then. Had to be." Mason said, "I done got. What the fuck. Impossible…." Mooney said, "Yeah." Mason asked, "I could be lying Joe, I could be lying like a motherfucker, you know?" Mooney replied, "Yeah. No telling what the fuck that dude got going on man, I don't know man. That's

the end of that. I don't like to see on they ass." Mason said, "Whatever he [Twyman] got going on that's uhh be the end of it." Mooney asked, "Did he [Twyman] call?" Mason answered, "Might of did, I had my phone off." Mooney said, "Yeah I know…" Mason stated, "Try to pull me, he try to pull me so I told his ass to drop me of at the gas station, I walked. Fuck all that." Mason said, "He like man you gone walk? I say hey man, have….you know what I'm saying? The words got short than a motherfucker. You know what I'm saying? I ain't had nothing to say to you? Know what I'm saying. What the fuck is going on? You know what I'm saying?" Mooney replied, "Uh huh." Mason said, "It's too close for comfort. First of all, I'm thinking like all shit, a motherfucker going to Chino [prison]." Mooney said, "Yeah." Mason said, "I don't know what the fuck you had me riding with you." Mooney said, "Uhh huh." Mason asked, "You know what I'm saying?" Mooney replied, "Yep. I don't know many but they…Do it seem like them [LEOs] though?" Mason asked, "You say what?" Mooney replied, "Did it look like them?" Mason asked, "Did it look like what?" Mooney replied, "Umm shit when they pull you over?" Mason replied, "Did it… Did it look like uhh. The law?" Mooney replied, "Yeah?" Mason said, "Man, white motherfuckers don't like look like the law to me period? They don't give a fuck what's…" Mooney replied, "Right." Mason said, "You know what I'm saying? They don't look like it. But, you know what I'm saying? I'm tripping about how quick they got up outta here. You know what I'm saying? That's impossible. This shit happen in like six or seven minutes roadie." Mooney replied, "Right. Let me get that bam." Mason said, "Bam. And all the put that phone, leave that phone on the seat. They didn't touch em, I'm looking at em,

they didn't touch phone and got up outta there. Robbery. Flat-out, if, ands, no if, ands or buts about it."

Mooney asked, "Where he had at it [narcotics], in the trunk?" Mason replied, "Uh uhh. Front seat. Front seat." Mooney replied, "Uh, uh." Mason said, "Front seat. Well fuck and you know what I'm saying? The fact that they was you know what I'm saying? And he. He. I don't know. They ask him [Twyman] like man why you give us two addresses? What's going on? Why you give us two addresses? They ask him like that. He like I didn't give ya'll no two addresses. I gave you one address. You know ain't I don't know if I heard him say another address. Whatever it was they was on his heels but whatever it is it happen on his behalf, I can tell you that." Mooney asked, "Why they ask him for an address?" Mason said, "Naw, they ask him where we stay at. You know what I'm saying?" Mooney replied, "Right." Mason asked, "But I get they told him, ask him man you gave us two addresses. They was like who car this is? He was like this my wife car. They was like this a nice car you got. What you do? Ask him what you do? What you do for a living?" Mooney said, "Hmm." Mason said, "They like everything clean right? This was they second word. Ain't nothing in here you know what I'm saying double or, ya'll cool right? None of that bullshit up in there? Yeah, yeah. As long as ya'll name straight ya'll name straight, ya'll good. Ya'll good to go. Impossible for a motherfucker to check a name that fast. It ain't never happen." Mooney replied, "Right." Mason asked, "You know what I'm saying?" Mooney replied, "Yeah." Mason said, "How the fuck they gone check my name that fast? First of all how? They couldn't check mine that fast. They got to do." Mooney asked, "They went

in the car and ran his I.D.?" Mason answered, "Yeah but it was too quick what I'm trying to tell you, roadie." Mooney said, "Yeah. Yeah." Mason said, "Yeah." Mooney said, "They probably didn't have shit. Probably didn't have them thangs in them damn cars." Mason said, "Man, I don't know what they have. You know what I'm saying. They ain't take us to the car." Mooney replied, "Hmm." Mason said, "I don't know, I ain't pay no attention. I got. My head is really beat. I'm like shit. Yeah. Yeah we was rob, it was robbery, robbery, rob. We was robbed." Mooney said, "I hope that was what it is. I don't know what the fuck."

Mason said, "Whatever it is. You know what I'm saying? I can't see. I don't know. I know one thing, I can't. Whatever it is, it's on his [Twyman's] behalf. That's for damn sho." Mooney said, "Right. Well fuck. What happen with whatcha-ma-call-em?" Mason asked, "Who?" Mooney replied, "Big dude?" Mason said, "The other way. Yeah? You say the other one? The other dude?" Mooney replied, "Yeah." Mason replied, "Shit, I was wrapped up with him. He call me. Call me like the motherfucker. I'll be right back, I'm uh call you right back."

### 2. On February 26, 2018, Pugh Distributed Approximately 186 Grams of Cocaine to William Rutledge and Discussed Law Enforcement's Seizure of that Cocaine with Mason and Mooney

As set forth in the Complaint (Dkt. #1 ¶¶ 117-125), in intercepted telephone calls, Pugh and Rutledge discussed Rutledge purchasing narcotics from Pugh. Pugh then delivered approximately 186 grams of cocaine in the vestibule of Mason's residence. After the transaction, law enforcement officers stopped Rutledge and found cocaine in his vehicle. During calls after the stop, Pugh and Rutledge and Pugh

and Mason discussed the nature of the stop and the seizure of the narcotics. Mooney and Pugh discussed the stop and seizure and whether any of Mooney's street level dealers were stopped by law enforcement.

Specifically, on February 27, 2018, at approximately 12:29 a.m. (TP3 Session #2107), Pugh received an incoming call from Mooney. Pugh asked, "Your people good?" Mooney replied, "Yeah." Pugh stated, "Man shit…my little man [Rutledge] nem got miked [stopped by law enforcement]. The bitch that left…Remember I came, remember I went outside before little man got there right…I have gave my girl sister something to check out for me, so when they leave they get miked by the same grey Taurus, now they let them go they ain't find shit, they leave, they come right back I guess. When my little man came in and left out they pulled him over nor we seeing him pulled over, you know what I'm saying like we, we looking at them got them me and my uncle. Cause both of us left out when searching for umm…They got him pulled over. Now the minutes that got him pulled over I'm sitting there watching them they let him go. Now we just talking and shit. He say he just go to the Police Station cause they took 1400 out of his pocket and didn't goddamit didn't umm, didn't charge em, you know didn't say nothing. Now all the time he fo to the dip in the door to get the shit out cause he almost at the crib, he say it's gone." Mooney replied, "hmm ugh." Later in the conversation Mooney stated, "Time to move around, man. Fuck this, fuck this." Pugh replied, "I already know, ohh hell yeah. This shit ugly. That's crazy."

G.    **Text Message Communications**

1.    **Text Communications with Kimberly Pugh**

a.    **February 7, 2018**

On February 7, 2018 from approximately 11:22 p.m. to February 8, 2018 at approximately 12:19 a.m., Pugh sent a photograph to Kimberly Pugh depicting suspected narcotics on a table at Mason's residence.  Pugh later told her that he was leaving Mason's residence.

Kim:          Wtf are u doing

Pugh:         [photo depicted below]



Pugh:         What's wrong

Pugh:         Where you at

Pugh:       Are you on your way

Kim:        Where r u..

Pugh:       Leaving chip crib [Mason's residence]

**b.     February 16, 2018**

On February 15, 2018 from approximately 9:44 p.m. to approximately 10:23 p.m., Pugh told Kim that he was working at Mason's residence and sent a photo depicting the manufacture of narcotics on a table at Mason's residence.

Pugh:       What time u coming home

Kim:        When my stink come

Kim:        Why my stink ready

Pugh:       I guess we can stink

Kim:        U ready to go in stink

Kim:        Hello stink

Pugh:       In like 30 minutes

Kim:        Ok my stink

Kim:        I'm leaving here

Pugh:       I'm still working stinky

Kim:        Where are u

Pugh:       Chip [Mason's residence]

Pugh:       [photo depicted below]



### 2.  Unknown Individual

On February 28, 2018 from approximately 12:22 a.m. to approximately 3:00 p.m., Pugh agreed to provide an unknown individual ("UI"), with the contact name "Big Bro Looney", with a quantity of narcotics.  During the conversation, Pugh told the UI that he was at Mason's residence preparing the narcotics.  Pugh then sent a photo of the bagged narcotics.

| UI: | lil bro any news on the link |
|---|---|
| Pugh: | Yes chip [Mason] waiting on it for u |
| UI: | Gucci |
| UI: | [Screenshot of text message exchange between UI and another unknown individual] |

| | |
|---|---|
| UI: | You want shoot west they want 20 cod |

***

| | |
|---|---|
| UI: | What you want do later |
| UI: | N hour or what you want me tell him |
| Pugh: | Meet me on 12 in like an hour |
| Pugh: | At the Walgreens |
| UI: | Ok let me text him n tell him hour |
| Pugh: | Ok |

***

| | |
|---|---|
| UI: | Wya [where you at] |
| Pugh: | Black boy [Mason's residence] |
| UI: | You ready meet me on 55 dan Ryan |
| UI: | Got drop these kids off Wya bro |
| UI: | Or want me b bac later |
| Pugh: | I'm almost done |
| Pugh: | [screenshot depicted below] |



### H.    Post-arrest Statement of Myers

With respect to Myers' participation in the conspiracy, the government will present admissions of Myers made during his post-arrest interview about the operation of the conspiracy and his participation in it.   More specifically, we anticipate introducing the following statements of Myers, among other statements: (1) Mason sold approximately 100 to 200 grams of heroin out of his residence; (2) Mason kept heroin in coat pockets and behind a mirror in the master bedroom bathroom; (3) Myers knew Pugh; and (4) Myers distributed marijuana on behalf of Mason.

## V.    STATEMENTS MADE DURING AND IN FURTHERANCE OF THE CONSPIRACY

At trial, the government may seek to introduce the substance of conversations,

which relate to this conspiracy. Examples of these conversations are included in the section above.

Some of the types of statements that the government proposes to offer as coconspirator statements are described below. These statements are some examples of the statements offered, which are not intended to be all encompassing but rather to explain the premise for the admission of the statements that fall into the category of coconspirator statements. All of the statements that the government will offer were made during the course of the conspiracy. At this time, the government anticipates that these statements will be introduced through the intercepted communications, some of which are detailed above, as well as text message communications and the testimony of a coconspirator.

A.    **Conversations about drug supply and drug proceeds matters**

Conversations between members of the conspiracy concerning various aspects of their drug trafficking (in particular, with the co-defendants), including but not limited to:

1.    Conversations about drug quantities and prices;
2.    Conversations about drug quality;
3.    Conversations about logistics of narcotics transactions;
4.    Conversations about payments or money owed; and
5.    Conversations about deliveries and pick-ups of drugs and money.

B.    **Conversations with coconspirators about the drug trafficking operation**

Conversations between members of the conspiracy concerning various aspects of their trafficking, including, but not limited to:

1.    Conversations about the quantity of the drugs;
2.    Conversations about the type of drugs possessed or desired;

53

3. Conversations about the timing and delivery of drugs;

4. Conversations about the price of drugs;

5. Conversations about the timing, manner, and amount of payment;

6. Conversations about what quantities or types of drugs the conspiracy's customers were buying or getting, what price customers were paying, and to whom coconspirators had received drugs or paid money;

7. Conversations about the collection of cash drug proceeds;

8. Conversations concerning the seizure of narcotics and conversations geared towards discovering the reasons for the seizure;

9. Conversations concerning efforts to avoid apprehension by the government, and to conceal the nature of their activities; and

10. Conversations about the manner in which the codefendants and their coconspirators were conducting their drug operation.

## VI.    CONCLUSION

The above is an outline of the evidence that the government will introduce to establish that the charged conspiracy existed and that the defendants were members of the conspiracy. The Court should find, based upon this proffer, that coconspirator statements are admissible pending the introduction of evidence to support this proffer.

Dated:         January 24, 2020

Respectfully submitted,
JOHN R. LAUSCH, JR.
United States Attorney

By: /s/ *Kristen Totten*
KRISTEN TOTTEN
MATTHEW L. KUTCHER
EDWARD A. LIVA, JR.
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-5300