UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | | |
|---|---|---|
| | Plaintiff, | |
| v. | | No. 18 CR 157-4 |
| | | Honorable  John Z. Lee |
| DEON PUGH | | |
| | Defendant | |

**PUGH' RESPONSE OPPOSING ADMISSIBILITY OF HEARSAY EVIDENCE**

The Defendant Deon Pugh by his attorney, Carl P. Clavelli, hereby moves this Court to deny the prosecutions request to admit testimonial hearsay pursuant to *Santiago v. United States*, 582 F.2d 1128 (7th Cir. 1978), and Rule 801(d)(2)(E), Federal Rules of Evidence, on the basis that the factual allegations set forth by the Government in their proffer are insufficient to establish the exception to the Confrontation Clause for each of the intercepted, but unspecified, communications for which admission may be sought at trial; in support of which he states:

Each of the remaining defendants, Jonathon Mason, Kareem Mooney, Deon Pugh, Dennis Myers, Ryan Pearson, as well as Kevin Twyman, Eduardo Anderson, Dennis Wiltz, Alvin Williams and Martell White, each of whom have entered into Plea Agreements, were charged in Count One with participating in a single conspiracy to distribute heroin and fentanyl in violation of 21 U.S.C. § 841(a)(1). Indictment, Count One, ¶ 1; D.E.1.  Continuing into ¶ 2, Count One adds the penalty language from § 841

(b), Penalties, making it an element of the enhanced offense charged a finding of the distribution of mixtures containing 400 grams of fentanyl and over one kilogram of heroin. With the exception of Count Five charging only Mason and Wiltz, only Count One alleges an offense carrying a mandatory minimum term of ten years under 21 U.S.C. §§ 841 and 846. Count One charges that one member of the conspiracy, Williams, is responsible for 100 grams or more of heroin only, a five-year mandatory minimum. Count One also excepts the co-conspirator Myers from the fentanyl distribution scheme alleging that he distributed heroin only but in a quantity exceeding one kilogram subjecting him also to the ten-year mandatory minimum. Of those who plead guilty, only Williams entered into a plea to a conspiracy, albeit to a lesser conspiracy than is alleged in Count One against the other Count One defendants.

Unlike a typical drug conspiracy that alleges a continuing series of related acts, easily seen as part of a common scheme, the proof proffered in the Government's Santiago proffer sets out a few isolated drug deals, none of which involve more than three of the named defendants as participants one of whom is usually Wiltz. There are no common elements established and the distributions are not related to drug sales that occur either before or after; each of the described sales and distributions stand as separate acts without a common agreement that benefits those defendants who are not participants in the act described. The Government's theory apparently is to proffer conversations between Mason and others, including his friend, Deon Pugh, as well as those intercepted

from Pugh's telephone, and with the assistance of Wiltz, attempt to connect the conversations into the single conspiracy charged in Count One. See, Government's Santiago Proffer, 'Proffer', at pp. 3-4, 16.

Whether Wiltz's statements support a conspiratorial relationship, cannot be gleaned from the sparse claims found in the Proffer. Certainly the intercepted conversations do not support the usual elements of a conspiratorial relationship. There are no discernible roles among the alleged members and no interdependence of one upon the other except, as mentioned, within the unrelated distributions that simply mark these defendants as drug dealers. Possibly once a Plea Agreement is finally agreed upon by Wiltz, the cooperator, there will be additional factual submissions to support the conclusions contained within the Proffer. Interestingly, Wiltz is not a party to any conversation intercepted from either Pugh or Mason's phones. As Wiltz's statements are being offered as the lynchpin for any finding of a conspiratorial agreement with Mason, his benefactor, and Pugh, Wiltz's credibility must be an issue to this Court's decision and one that cannot prevail at this time to deprive these defendants of their constitutional right to Confront the evidence without the damning cloak of unsubstantiated hearsay for which they may individually not be aware.

The Government's Santiago proffer is so woefully inadequate to serve the purpose for which it was intended that it makes sense to repeat some of the relevant history. Traditionally conspiracies were cloaked in secrecy. *United States v. Hooks*, 848 F.2d 785,

792 (7th Cir. 1988). Recognizing, however, that a crew of like-minded criminals could create and commit greater crimes and harm than an individual perpetrator, special rules were developed to reveal the inner workings of a true criminal enterprise. Cf. *Direct Sales Co. v. United States*, 319 U.S. 703 (1943); Developments in the Law, Criminal Conspiracy, 72 Harvard Law Review 920 (1959). Thus, an examination of the "circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts and the totality of their conduct may serve as proof" of an agreement to commit substantive criminal acts. *United States v. Hooks*, supra, 848 F.2d at 792. Here there is no overarching agreement to engage in conduct with a common goal.

A generous reading of Count One of the Indictment in conjunction with the Government's Santiago Proffer points to Mason as the central figure in the distribution of heroin. The disjointed conduct described in the Proffer fails to satisfy the central element of a conspiracy, however. Most importantly, a conspiracy is marked by a single common agreement so that the actions of any single member benefits the others. Individual drug deals, buy-sell agreements, do not share any common purpose with conspiratorial acts. *United States v. Cruse*, 805 F.3d 795, 815-16 (7th Cir. 2015); *United States v. Payton*, 328 F.3d 910, 911-12 (7th Cir. 2003); *United States v. Brock*, 789 F.3d 60, 63-64 (2nd Cir. 2015). Examples of the drug deals specified in the Proffer will be shown as buy-sell agreements only. At trial, Pugh would be submitting a jury instruction defining a buyer-

seller arrangement. See, Seventh Circuit Pattern Instruction 5.10(A)(2012). Chief among the many relevant factors is the fact that Mason never extended a sale on credit to Pugh.

A basic theory of prosecution that underlies each conspiracy prosecution is that the individual members participating in a charged conspiracy possess the same requisite intent when committing substantive offenses. Many court cases conclude that an agreement may be imputed based on conduct and conversations attributable to alleged participants from which their intent may be derived. Cf. *United States v. Bourjaily*. 483 U.S. 171 (1987). Long ago in *Ingram v. United States*, 360 US 672, 678 (1959), the Supreme Court noted that "an essential element of the proof was knowledge" of the illegality of the act in question. "'[C]onspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive act itself." Id. (citing, Developments in the Law, Criminal Conspiracy, supra, 72 Harvard Law Review at 939 (authorities cited)). While the evidence proffered may have shown certain subgroups, there is no evidence proffered that Pugh's dealings with Mason – even acknowledging that Mason was known to associate with others in the drug trade, benefitted Pugh in any way such that the success of Pugh's drug dealings was somehow dependent or related to those of other subgroups. A closer examination of Pugh's conduct demonstrates a sporadic relationship with Mason and that both are independent dealers who are also friends who occasionally discuss the drug business.

The case of *Pinkerton v. United States*, 328 US 640, 644-45 (1946) is often cited but for legal theorem outside of the narrow parameters of the case itself. In *Pinkerton,* two brothers were shown to have acted together to violate the tax laws and were found guilty of six related substantive offenses as well as the general conspiracy statute for their overall course of conduct. The issue was whether a conspiracy conviction could stand along with the substantive convictions as separate offenses for the same conduct whereas under earlier cases the conspiracy merged into the completed crime. It is here where the concept of a conspiracy being a separate crime due to a common objective that was seen to be much more than the sum of its individual parts, being the substantive offenses themselves. Thus, the unlawful agreement was said to be "distinct from the doing of the act." There was no knowledge issue, as here; the facts easily supported each defendant brother's knowledge of the overall scheme.

The *Pinkerton* case is credited with being the progenitor of a broad statement setting out a coconspirator's liability: "A defendant is responsible for a substantive offense committed by his coconspirators unless the criminal act 'was not in fact done in furtherance of the conspiracy, did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary consequence of the unlawful agreement.' *Pinkerton v. United States*, supra, 328 US at 647-48." *United States v. Sandoval-Curiel*, 50 F.3d 1389, 1392 (7th Cir. 1995).

Again, unlike here, the charged conspiracy involved a single delivery of four kilos of cocaine, a single object conspiracy.

Different formulations of the broad concept of conspiratorial liability are no more helpful, particularly when the facts point to multiple participants and multiple transactions. The main objective of a criminal conspiracy is to agree to achieve a common objective as shown in a jury instruction given in *United States v. Diaz*, 876 F.2d 1344, 1352 (7th Cir. 1989):

To convict a defendant of participation in a single conspiracy with other defendants, it is sufficient if it is established that: '[t]he parties to the agreement were aware that others were participating in the scheme. The coconspirators must have knowingly embraced a common criminal objective.

So the answer to how a conspiracy is shown to exist lies in a participant's knowledge of a common objective and his agreement to provide mutual support toward achieving the object of the agreement.

The Indictment charges Pugh with being a member of a conspiracy with each of those named codefendants making him potentially liable for their individual acts in support of the unstated common agreement. To find Pugh guilty, a jury would be instructed, *inter alia*:

To be a member of a conspiracy, a defendant does not need to join it at the beginning, and he does not need to know all of the other members or all of the means by which the illegal goals of the conspiracy were to be accomplished. The government must prove beyond a reasonable doubt that the defendant you are considering was aware of the illegal goals of the conspiracy, and knowingly joined the conspiracy.

Seventh Circuit Pattern Instruction, 5.10, in relevant part only.  And further,:

It was reasonably foreseeable to the defendant that other conspirators would commit the crime charged in Count _____ in order to advance the goals of the conspiracy. The government is not required to prove that the defendant actually knew about the crime charged in Count _____ or that the defendant actually realized that this type of crime would be committed as part of the conspiracy.

Seventh Circuit Pattern Instruction, 5.11, in relevant part only.

While the Pattern Instructions explain that a conspiracy is an agreement to commit a crime, the general instructions do not focus on the scope of the individual member's agreement.  This generalized definition serves the needs of a traditional conspiracy – when a defendant's sentence is considered by a judge at sentencing in proportion to their role in the conspiracy, but not one in which the punishment is defined as the element of the offense as with § 846. Left unanswered by the cases closely following *Pinkerton*, those cited in the Government's Proffer, was how to determine the scope of the conspiratorial agreement.

A person who agreed to facilitate a specific purchase of drugs on a single occasion, even with knowledge of the distribution network, cannot be said to have agreed to the objective of an ongoing series of drug sales without some stake in the continuity of the drug sales. See, e.g. Guidelines, ¶ 1B1.3, Application Notes, 2(c)(5). This note describes a drug dealer's girlfriend who agrees to participate in a single delivery due to his illness. This single act defines the scope of her agreement.  However, a jury limited by a

*Pinkerton* instruction would be permitted to find the girlfriend in the example guilty of a conspiracy broadly charged as is Count One requiring a ten-year sentence.

"The Sentencing Reform Act of 1984 . . . created the Sentencing Commission and charged it with the task of 'establish[ing] sentencing policies and practices for the Federal criminal justice system'. (Citations and Statutes omitted)." *Stinson v. United States*, 508 US 36, 40-41 (1993). Citing *Williams v. United States*, 503 U.S. 193, 201 (1992), the Court reiterated that the Guidelines' policy statements are an authoritative guide to the meaning and interpretation of sentencing policies. Id. at 42-43.

In *United States v. Booker*, 543 U.S. 220, 246 (2005), the Court interpreted Congress' intent in passing the Sentencing Reform Act to "make the Guidelines system advisory while maintaining a strong connection between the sentence imposed and the offender's real conduct – a connection important to the increased uniformity of sentencing that Congress intended its Guidelines system to achieve." By choosing to modify the Sentencing Reform Act, the Court preserved its basic function. "Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity. . . . It consists more importantly, of similar relationships between sentences and real conduct." 543 US at 253-254. Thus, the basic notion underpinning the Guidelines' sentencing system is premised in large part on the application of the relevant conduct policies. Guidelines, § 1B1.3, Relevant Conduct.

Prior to *Apprendi* a jury could find a codefendant guilty of a drug conspiracy without making a finding as to which acts were shown to be within an individual defendant's agreement or upon which acts it was relying. Establishing drug quantities remained a judicial function as are most sentencing factors. Since the decision in *Apprendi v. United States*, 530 US 466 (2000), however, in cases brought under the Controlled Substances Act of 1970, the jury determines not just the elements of an § 846 conspiracy - still without identifying the substantive acts upon which it relied but in many cases locking in a mandatory minimum sentence. Since §§ 841 and 846 contain their own mandatory sentencing provisions as an element of the offenses defined therein, juries are left with only the general conspiracy instructions with which to determine the drug quantity attributable to a conspiracy without regard to the role of the individual defendant. Since the rules for determining relevant conduct and the elements of a conspiracy are fundamentally different, the pre-trial decision as to the admissibility of hearsay evidence takes on a greater significance than when the decision in *United States v. Santiago*, 582 F.2d 1128 (1978), was decided.

As the relevant conduct Commentary advises:

The principles and limits of sentencing accountability under this guideline are not always the same as the principles and limits of criminal liability. Under subsections (a)(1) and (a)(2), the focus is on the specific acts and omissions for which the defendant is to be held accountable in determining the applicable guideline range, rather than on whether the defendant is criminally liable for an offense as a principal, accomplice, or conspirator. U.S.S.G. § 1B1.3, Commentary, Application Note 1, Sentencing Accountability and Criminal Liability (2017).

The difference between criminal derivative liability under traditional conspiracy law and the mandatory sentencing provisions of Count One is owing to the fact that the Controlled Substances Act is "an amalgam of offense elements and sentencing factors." *Moncrieffe v. Holder*, 569 U.S. 184, 195-96 (2013). In *Moncrieffe*, the Court reiterated its observation first made in *Carachuri-Rosendo v. Holder*, 560 U.S. 563 (2010), that "when Congress has chosen to define the generic federal offense by reference to punishment, it may be necessary to take account of federal sentencing factors too." Id.

When the Controlled Substances Act of 1970 was passed into law, the Guidelines were not a consideration. Had they existed, it is reasonable to assume that Congress would have adopted guideline language and principles to assure that defendants receive equal treatment. Section 841 is both unusual and troublesome because it combines both elements and sentencing factors into a single statutory submission that does not even attempt to define the conduct that would be counted as being relevant to the drugs distributed by an individual during the course of otherwise conspiratorial events. Given the historic implementation of sentencing Guidelines, conspiracy principles fail to provide for the uniformity among individual defendants derived from a consideration of their real conduct. In order to obtain any semblance of uniformity and equal protection for individual defendants charged with drug conspiracy, a jury would have to be advised of the definition of relevant conduct as a limitation upon historic conspiratorial principles as existed prior to the Sentencing Reform Act.

In this regard, the Government's Santiago proffer is not helpful – even with its frequent citation to conspiracy cases, it is almost devoid of facts to provide the necessary nexus between the specific substantive acts described therein and the task of any fact-finder to assess a single overarching agreement, the minimal requirement for linking individual acts of criminal conduct into a criminal conspiracy. Just because a potential witness will state that Pugh spent a considerable amount of time with Mason tells nothing of their relationship as co-conspirators. More telling are the details of Mason's drug transactions having nothing to do with Pugh or the people he is found to work with in a much smaller scheme: Alvin Williams, Martell White and Ryan Pearson. See, Infra at 14.

The period of the charged conspiracy is from September 7, 2017 thru March 18, 2018. Apparently the case began with the assistance of CS-1. Counsel expects the trial evidence to include the following transactions none of which involved Pugh. After discussing a 100-gram heroin transaction from September 7 thru September 14, with Anderson on Target Phone 2, CS-1 met Mason and Wiltz outside a restaurant on September 14, 2017, and consummated the deal. Complaint, ¶¶ 14-37. Beginning on October 17, 2017, CS-1 began to communicate directly with Mason. On October 18, with Wiltz's helping, Mason distributed another 115 grams of heroin. Complaint, ¶¶ 39-51.After yet another request from CS-1 on November 20, 2017, Mason distributed another 113 grams of heroin to him two days later. Complaint, ¶¶ 52–74. CS-1, a buyer, was no more a conspirator with Mason than many others, including Pugh.

In addition to having many bulk customers, the Government's submission identifies some of the defendants to be Mason's suppliers. Mooney is said to have been a supplier to Mason. Proffer at pp. 19-20, 24-27. Mooney had a relationship with a drug supplier and became a middleman for Mason; "Wiltz drove Mooney to the supplier's residence located at 51st and Martin Luther King Drive at least four or five times . . . and met Mooney at the supplier's residence at least four or five times." Proffer at p. 19 Using the conservative estimate from the figures provided in the Proffer, Wiltz would testify that Mooney assisted Mason in the purchase of 1600 grams of heroin (8 x 200).

Wiltz also dealt with a supplier named 'Poo' and claims to have picked up both cocaine and heroin from him which he delivered either to Mason or Mooney. Proffer at p. 20. Wiltz also claims to have delivered heroin to "Mooney's customers." Among them, Wiltz recalls delivering "20 to 40 grams of heroin to a customer named Nemo approximately four times per month." Another customer Wiltz dealt with on a recurring basis was "Tow Truck." Proffer at pp. 20-21. Apparently, Wiltz is prepared to testify to his intimate knowledge of where Mason kept his stash, an area "in the Master bedroom's bathroom" not accessible to others who gathered at Mason's to gamble.

Utilizing its wiretap evidence, the Complaint sets out a series of transactions between November 7 and November 15, 2017, during which Mason uses Twyman as a middleman in the purchase of narcotics. Complaint. ¶¶ 80-95. Twyman also discussed supplying Mason with fentanyl as early as November 8, 2017. Complaint, ¶ 96. Twyman

located a supplier and discussed purchasing fentanyl with Mason until the date of delivery on December 6, 2017. After picking Mason up, law enforcement officers observed Twyman drive to 172 N. Halsted Street where it is believed a transaction to purchase fentanyl took place. Complaint, ¶¶ 99-116. After staging a traffic stop, police seized 499 grams of a substance containing fentanyl. Id. Pugh is charged in the Count One conspiracy with criminal liability for the fentanyl seized on December 6, 2017, itself qualifying for the ten-year mandatory minimum.

Wiltz is expected to provide some details of Mason's relationship with Twyman. Proffer at pp. 22-23. Wiltz is said to have observed Twyman deliver heroin to Mason "on approximately 15-20 occasions." The only connection to any of Twyman's activities is supplied by Wiltz who claims that Pugh was at Mason's house when Twyman delivered another batch of fentyl on an unspecified date; there is no wiretap recordings to support this claim. Wiltz merely states that he recalls Pugh using a strainer to bundle heroin into individual $10 baggies to be bundled for street sales. Proffer at 23.

This account flies in the face of a myriad of other evidence. Pugh's involvement with mixing heroin came after February 1, 2018, and is clearly marked as such in the conversation intercepted on February 8, 2018, when Pugh tells O'Bryant he only had the spot for a week. Complaint ¶ 138. All of the evidence of Pugh mixing heroin is limited to the street sales he initiated on February 1, 2018, and the placement of the heroin mixture into $10 baggies and then bundles of fifteen each.  See, e.g., Proffer, pp. 48-52. Even the

heroin Pugh mixed at Mason's was his and not purchased from Mason. In his Proffer of May 14, 2018, Wiltz told the agents that Pugh "provided narcotics to be mixed by Mason." Proffer at p. 6. During the period after February 1, 2018, Pugh is shown to work with codefendants Williams, White and Pearson but in a much smaller scheme involving street sales. See, Complaint at ¶¶ 117-186. Mason's fentanyl activities with Twyman are all in 2017. Further, if Pugh were to testify at his trial, he would state that he had never met Twyman until after their arrests in this case. As there was a pole camera trained on Mason's residence on Champlain, there should be graphic evidence that Twyman and Pugh were in the house at the same time and there is none.

Wiltz also misspoke when he claimed to have brought 100 grams to a BP station near 63rd and State. Proffer at p. 22. In his individual Proffer of May 14, 2018, Wiltz attempts to describe how Mason asked him to bring "100 grams of heroin . . . to the BP station at 63rd and State." Wiltz Proffer, 5/14/2018 at p. 5. When the audio of the February 9, 2018, call was played for Wiltz, he recalled that the reference to "four bricks" was to four bundles of $10 baggies that Pugh had mixed and bagged earlier that day and left at Mason's house. Wiltz Proffer at pp. 5-6. Wiltz gave it to a heavy-set black person at 63rd and Vernon. Wiltz said in his proffer that it was the only time he had delivered drugs for Pugh. Id.

When the arrests were made on March 18, 2018, a search of Mason's residence at 6424 S. Champlain Avenue, Chicago, found a storehouse of heroin hidden in areas

subject only to his control. As Mason's telephone had not been the subject of a court-approved intercept order after December 6, 2017, the origin and sales of heroin during that period until the arrests are unknown. Pugh's telephone was the subject of intercepts during the period February 7 thru March 7, 2018, during which he is not heard to purchase any drugs from Mason and discusses only small quantities of heroin with either White, Williams or Pearson. While the Proffer does not address whether its trial position would be that the drugs seized from Mason's residence are alleged to be part of the conspiracy charged in Count One or if all of the drugs purchased and sold by Mason are done so as part of the charged conspiracy, a jury given only generalized instructions defining a conspiracy could come to that conclusion.

Permitting all of the drugs Mason is said to have distributed, according to Wiltz a kilo each week, would violate the principles of the Sentencing Reform Act and its relevant conduct Guideline. Since there is no evidence that Pugh ever supplied heroin to Mason, none of the foregoing activity involving the purchase of heroin by Mason can be attributed in any fashion to Pugh. As a result, a jury will have to be forewarned not to consider much of the evidence found in the Proffer against Pugh. These Guidelines' principles by virtue of the definition of relevant conduct, would limit Pugh's derivative liability for the substantive acts described in the Proffer to Pugh's own purchases from Mason between November 3 and December 1, 2017; none of the other drugs Mason

purchased or distributed were part of a "jointly undertaken" activity that Pugh could be found to have joined.

Furthermore, the presence of both sentencing and fact elements within the statutory language of 21 USC § 841 provides for a unique interplay between the drug offenses charged in Count One and the relevant conduct rules found within the Guidelines. Courts have recognized the disjunction between the definition of relevant conduct found within the Guidelines and conspiratorial liability. Though the Guidelines are utilized in every sentencing case, only in jury cases when § 846 is charged is an individual defendant's mandatory minimum sentence derived solely upon the archaic notions of *Pinkerton* liability. In *United States v. Salem*, 597 F.3d 877, 884 (7th Cir. 2010), a wire fraud case, the Seventh Circuit clarified an earlier ruling to make clear that evidence of an agreement incorporating the conduct at issue would satisfy the Guidelines definition of relevant conduct that references a joint undertaking and reasonable foreseeability. Despite knowledge of each aspect of the scheme, the Court found that portions of the losses were not from the efforts of the appellants. In so holding, the Court did not alter its prior holdings concerning conspiratorial liability which was always determined by the scope of a party's agreement but gave further substance to the different theories of liability by recognizing that the Guidelines definition of relevant conduct encompassed the additional requirement of determining the extent of jointly undertaken activities: "A criminal scheme 'undertaken by the defendant in concert with others' is included within the

definition of a 'jointly undertaken criminal activity.' (quoting U.S.S.G. §

1B1.3(a)(1)(B)." In other words, the Court held, "the mere foreseeability of another's

conduct is not sufficient to bring that conduct within the scope of a defendant's jointly

undertaken criminal activity." 597 F.3d at 885.

In an earlier case, *United States v. Soto-Piedra*, 525 F.3d 527, 533 (7th Cir. 2008),

the Court concluded that the "[a]ctions of coconspirators that a particular defendant does

not assist or agree to promote are generally not within the scope of that defendant's

jointly undertaken activity." *Salem* adopted the central holding of *Soto-Piedra* that "the

scope of the jointly undertaken criminal activity 'is not necessarily the same as the scope

of the entire [scheme].' U.S.S.G.  1B1.3 comment n. 2." 525 F.3d at 531-32.  As in these

cases, Pugh did nothing to further the activities of Mason in conjunction with Mooney or

Twyman on the supply side, or CS-1, Nemo, Tow Truck or diverse others who purchased

heroin from Mason. Allowing evidence of those transactions to be considered against

Pugh would violate his Constitutional right to confront the evidence against him and

deprive him of his Constitutionally protected rights to due process and the equal

protection of the law.

The question was squarely addressed in *United States v. Becerra*, 992 F.2d 960,

966-67 (9th Cir. 1993). As the penalty for this drug conspiracy was determined by the

sentencing judge before *Apprendi* caused the issue to be put to the jury, the issue on

appeal was that the judge miscalculated the drugs attributable to their involvement in the

conspiracy by failing to utilize the relevant conduct principles. The appellants framed the issue as an error in finding that it was reasonably foreseeable for them to expect the large purchase of 25 kilos "or that each had agreed to a conspiracy of that scope." Id. Relying on the language of the statute and ignoring the changes that were part of the Sentencing Reform Act, the government argued that the conspiracy to violate § 841(b)(1)(A) allowed a court to sentence based on the amount of drugs "involved" in the offense itself. Instead, the Court "reject[ed] the government's argument that sentencing under the statutory mandatory minimums should differ from the Guidelines." 992 F.2d at 667, n.2. Explaining its decision, the Court observed that it saw "no reason why" the prosecution would be relieved from establishing "that a particular defendant has some connection with the larger amount on which the sentencing is based or that he could reasonably foresee." Id.

Absent from the prosecution's Proffer is this controlling law setting out the importance of the common agreement to include only relevant conduct in assessing a conspirator's liability for the conduct of another. Cf. Proffer at pp. 4-11. It is not sufficient to ask did a conspiracy exist as it is only "jointly undertaken criminal activity" that delineates the scope of any agreement that determines derivative liability under the Guidelines. But See, Proffer at p. 5. Another recent case omitted from the prosecution's recitation is United States v. Davison, 761 F.3d 683, 685-86 (7th Cir. 2014). There, from evidence at a trial before Apprendi was decided, the Seventh Circuit focused on the acts

of distributing controlled substances shown at trial and asked the relevant question: "whether [the Appellant] joined with those other conspirators in a joint undertaking of which the making of those sales was an objective, or had agreed to join in such an undertaking." In simpler terms, the penultimate question was whether the defendant agreed to join in certain sales even if foreseeable to him. When applied to the disjointed facts presented here, even though Mason was known to be engaged in bulk sales of heroin, those sales were not jointly undertaken as part of any common objective, and not chargeable to Pugh. Evidence associated with those acts cannot be used against Pugh at trial under Rule 801(d)(2)(E).

After the decision in *Apprendi* placed the determination of drug type and quantity within the purview of a jury when the enhancement provisions of § 841 are charged, as here, the issue of uniformity of sentencing arose in a jury context in *United States v. Torres*, 869 F.3d 1089 (9th Cir. 2017). Though the jury received the cautionary instruction that limited its special drug finding to drugs "reasonably foreseeable" to each defendant, a majority of the panel believed that its decision in *United States v. Becerra*, supra, must guide them in assigning individual responsibility for the drug quantities charged in counts 7 and 8, violations of §§ 841 and 846. The *Becerra* Court went beyond general conspiracy law to adopt the Guidelines formulation for assessing derivative liability and, thereby, maintaining the congressional goal of achieving sentencing uniformity.

After reviewing the state of the law in the Ninth Circuit following *Becerra*, the panel majority found the question to be "straightforward" in that its recent holdings "require that the same standard be applied when sentencing for a conspiracy under § 841(b) as under the Guidelines." *United States v. Torres*, supra, 869 F.3d at 1105. The Court noted that the Guidelines language necessary to apportion a drug amount to an individual defendant must inform a jury that it may only consider "conduct 'in furtherance of the jointly undertaken criminal activity.'" Id. at 1107. This formulation follows closely the rationale contained in *United States v. Davison*, supra. Pugh merely asks this Court to adopt the reasoning applied by Judge Posner in *Davison* to its findings here. Because the acts of drug distribution contained within the Proffer and pre-date February 1, 2018, do not meet the relevant conduct definition established with the approval of Congress for determining individual liability, evidence of those acts should not be admissible against him.

The Sixth Circuit decided *United States v. Hamm*, F.3d (March 6, 2020), in which it re-affirmed the role of the Guidelines' relevant conduct definition. The issue was whether the distribution of carfentanil found to have lead to the death of a drug user was properly connected to an act for which the appellants could be found to be legally responsible. In explaining its approach, the Sixth Circuit delineated the elements of a general conspiracy and found the facts to be sufficient to sustain that count. Slip Opinion At pp. 4, 10. However, the Court found that the jury was incorrectly admonished as to

two counts containing the "death-or-injury enhancement" found in 21 USC § 841(b)(1)(C). Slip Opinion at p. 8. The error was to "allow[] the jury to apply the enhancement using *Pinkerton* liability, a much broader theory" that failed to require the jury to determine whether the appellants "were part of the chain of distribution." Id.

To emphasize the enormity of the error, the Sixth Circuit expounded on the overall breadth of *Pinkerton* liability. Much like the prosecution did in its proffer here, the *Hamm* Court counted the prospects including that every conspirator could be held liable for every act performed by a coconspirator, whether "agreed upon, intended or even discussed. Citations Omitted." *United States v. Hamm*, supra; slip Opinion at p. 11. The enhancement could not be premised on *Pinkerton* liability alone because it was a "sentencing enhancement." Id. Relying on the rationale from *United States v. Swiney*, 203 F.3d 397, 401-06 (6th Cir. 2000) and *United States v. Walker*, 721 F.3d 828, 833-36 (7th Cir. 2013), *vacated on other grounds*, 572 U.S. 1111 (2014), the *Hamm* Court found that those Courts "drew a sharp distinction between guilt-stage liability for co-conspirators' substantive offenses, where *Pinkerton* has full force, and sentencing liability" under the Guidelines "where *Pinkerton* has been narrowed." Slip Opinion at p. 12. In so holding, the Sixth Circuit as has the Ninth Circuit has rejected the claim by the government that "the jury remains free to use *Pinkerton* liability to enhance the sentence." Id.

In *United States v. Walker*, supra, the statutory injury enhancement was placed into the hands of the judge after plea agreements failed to admit liability for the statutory

enhancement; this aspect of the case caused its reversal as *Alleyne v. United States*, 570 US 99 (2013), held that any fact not admitted as part of a plea that increases a sentence must be submitted to a jury. Nevertheless the decision is instructive for our purposes. The Seventh Circuit rejected the Government's claim that the guilt of each conspirator under the theory of *Pinkerton* liability was sufficient to sentence "each of the defendants [to] the same statutory penalty, regardless of their role in the conspiracy or connection to the drugs that killed the users." 721 F.3d at 831, 836. In a matter of first impression, and adopting the rationale expressed by the Sixth Circuit in its *Swiney* decision, the Seventh Circuit found that "the government's argument 'ignores the Sentencing Guideline's treatment of conspiracy' [which] outlines different sentencing consequences for different defendants 'in the case of a jointly undertaken criminal activity.' (citing U.S.S.G. § 1B1.3, Application Note 2)." Id. at 834-35. As a result the *Walker* Court held that "a defendant can only be subject to the enhancement if the distribution of heroin that ultimately lead to a victim's death was 'reasonably foreseeable' and in furtherance of jointly undertaken activity as defined in § 1B1.3(a)(1)(B)." See also, Id. at 836, Cases Cited. In an additional "finding," the Court agreed with the *Swiney* Court "that the Sentencing Guidelines have modified the *Pinkerton* theory of liability so as to harmonize it with the Guidelines goal of sentencing a defendant according to the 'seriousness of the actual conduct of the defendant and his accomplices.' Citations Omitted." Id. at 837.

Every defendant charged with the potential for a mandatory minimum finding by a jury is entitled to the protections afforded by the Guidelines. As the *Booker* Court concluded the congressional goal of uniformity in sentencing calls for more than just lip service; sometimes those procedures that were once thought to be fair must give way to the new reality that sentencing judges are informed by our federal Guidelines. The *Davison* decision is just the progenitor of what must come to ensure due process in the sentences of those charged with an § 846 conspiracy. If the Ninth Circuit is the first to recognize that *Pinkerton* style jury instructions are inadequate for the apportionment of criminal responsibility to the individual drug defendant, it will not be the last. Whether treated as an element or a sentencing factor subject to proof beyond a reasonable doubt, the only possible way to save §§ 841 and 846 from being constitutionally infirm is to guide a jury in its role as the fact-finder in the Guideline policies by which judges when acting as the fact-finder at a sentencing are bound. This task must begin at this stage when hearsay is sought to be admitted premised on a conspiratorial agreement.

Since it has taken lawyers and judges years to distinguish between the dual standards for determining guilt in conspiracy cases and a defendant's sentencing liability, it would be foolish to believe a jury of lay persons could apply hearsay evidence admitted for guilt without also relying on it for determining drug quantity and type. Because *Pinkerton* liability does not incorporate any limitation for "jointly undertaken criminal

activity," the admissibility of Rule 801(d)(2)(E) hearsay should be limited to preserve the due process rights of defendants such as Deon Pugh.

Evidence of Pugh's Drug Dealings

It is fair to say that Pugh has engaged in plea-bargaining at this juncture but without the parties coming to a meeting of the minds. For purposes of this Response, it will be shown that the proffered evidence against Pugh does not show him to have been in a conspiratorial relationship with Mason during the period after September 7, 2017; if a lesser conspiracy is established, however, it began on or about February 1, 2018, and would not include the proffered evidence of Mason's purchases of heroin and fentanyl during any portion of the period leading up to the arrests on March 18, 2018.

Pugh acknowledges that intercepted calls disclose the purchase of 50 grams of heroin on five occasions between November 7, 2017 and December 1, 2017. Some of those conversations are found within the Proffer while others are contained in an Affidavit associated with an intercept authorization. As luck would have it, Pugh's decision to sell heroin is captured on an intercept; in call 242 on November 7, 2017, Pugh is heard telling Mason that he was "trying to pump back up" and inquires as to the gram price for a 50-gram purchase for a customer. This series of calls results in a fifty-gram purchase on November 7, and again on November 15, and again on November 18, the 20, the 29 and possibly on December 1, 2017. Beginning with a conversation on November 18, Pugh told Mason that his customer was "crying about it being too hard." Both the

purchases and the conversations about the quality end abruptly on December 1, 2017, and it may be assumed that Pugh may have lost his customer and determined never to purchase heroin from Mason again. While there is at least one instance when Mason is attempting to entice Pugh to purchase a portion of some heroin that Mason was touting, there is no evidence that Pugh did so.

Even with the wiretaps, there is no indication that Pugh bought any narcotics from Mason between December 2, until his arrest on March 18, 2018. On February 8, 2018, Paris O'Bryant is telling Pugh about the prevalence of police activity ("It's hot as hell coming on that block."); Pugh inquires to ask if O'Bryant is referring to by Mason on Champlain or his spot, and states: "I ain't had the spot a week." Complaint, ¶ 138. Pugh is referring to the corner adjacent to a convenient store where Ryan Pearson worked at 408 E. 63rd Street and sold $10 bags of heroin.

As shown in the Proffer and the Complaint, after the hiatus of December 2 thru January 31, 2018, Pugh's activities with Mason began anew. Various sources including intercepts from Pugh's phone in response to his wife's inquiries (Proffer at pp. 48-52) and Wiltz previous individual proffers, indicate that Pugh was using Mason's blender and possibly his expertise to add mix to heroin he would bring to Mason's house to place into $10 baggies. In his Proffer of May 14, 2018, Wiltz told the agents that Pugh "provided narcotics to be mixed by Mason." Proffer at p. 6. The pictures attached to the proffer would indicate a few grams of heroin was being mixed at a time. While Pugh may have

taken advantage of his friendship with Mason to learn how to mix and bag heroin for street sales, there is no indication that Mason had a pecuniary interest in Pugh's venture.

Pugh was a supplier of marijuana to White and Williams and others as it had been his primary business until February 1, 2018. The evidence may show him to have made one or two ten-gram sales of heroin to them also. There is other evidence that, on a single occasion on February 26, 2018, Pugh sold 189 grams of powder cocaine to William Rutledge. Mason was not involved in any of the sales to White, Williams and Rutledge. As O'Bryant advised the prosecution during his proffer sessions, Pugh had other suppliers who were members of the BD gang as was O'Bryant. At any rate, the amount of heroin that may have been sold in the weeks after February 1, even by generous estimates, would not amount to 100 grams. When added to Pugh's five-fifty gram sales during November, 2017, all of Pugh's drug conduct after September 7, 2017, would not exceed 400 grams of heroin in total.  It is for this reason that permitting a jury to consider evidence of Mason's drug dealings which do not qualify as "jointly undertaken" under relevant conduct principles cannot be permitted on the support of the Government's Proffer.

Because Count One charges a sentencing enhancement, the usual application of *Pinkerton* liability must be limited to include the acts of Pugh himself and only those acts of an alleged co-conspirator that meet the Guidelines' definition of relevant conduct. For example, if anything, the object of the charged conspiracy was to sell heroin; absent some

connection to Pugh proving that he knew Mason was mixing fentanyl into his heroin, Pugh cannot be held accountable as a coconspirator for any amount of fentanyl, particularly the amount found in Count Five that was seized from Twyman on December 6, 2017, and which is included in Count One. Additionally, there is a conversation on February 12, 2018, in which Pugh is complaining to Mason that his street sales are "a little slow." Complaint, ¶ 125, at p. 65. Pugh postulates that rivals have added something (fentanyl) to give their product a boost because people were "complaining about dude. That's what's making me think he's doing something extra." Id.  This is further proof that Pugh was not aware that Mason had been known to add fentanyl to his mixture. For purposes of the Santiago Proffer, evidence related to activities of a co-conspirator which provide evidence of the enhancements for fentanyl and quantities of heroin over a kilo must be tempered to that found to meet the much narrower Guidelines' definition for relevant conduct and the jury must be so instructed.

WHEREFORE, the Defendant, Deon Pugh, requests that this Honorable Court limit the admissibility of the alleged coconspirators' statements identified in the prosecution's Santiago proffer, except those identified as statements of the Defendant Pugh.

Respectfully submitted,

*S// Carl P. Clavelli*
Carl P. Clavelli
1420 Renaissance Drive, Suite 213
Park Ridge IL  60068
(312) 953-8165
Attorney for Deon Pugh

CERTIFICATE OF SERVICE

I hereby certify that I filed and served the foregoing Response Opposing Admissibility upon all counsel who have appeared in this case and who use the Court's CM/ECF electronic filing system.


S/ *Carl P. Clavelli*
Carl P. Clavelli